NEW ENGLAND TELEPHONE & TELEGRAPH CO. v. UNITED STATES et al.

Civil Action No. 2274.

District Court, D. Massachusetts.

Dec. 17, 1943.

John J. Burns, Harvey Hoshour and T. Baxter Milne, all of Boston, Mass., for New England Telephone & Telegraph Co., plaintiff.

George S. Drew, of Somerville, Mass., for International Brotherhood of Telephone Workers, intervenor petitioner.

Thomas H. Bresnahan, of Boston, Mass., for New England Federation of Telephone Workers, intervenor.

Tom C. Clark, Asst. Atty. Gen., for the United States, defendant.

Charles R. Denny, Gen. Counsel, Benedict P. Cottone, Asst. Gen. Counsel, and Harry M. Plotkin and David C. Adams, all of Washington, D. C., for Federal Communications Commission, defendant.

Gay H. Brown, of Albany, N. Y., for Public Service Commission of State of New York, amicus curiae.

Before MAGRDUER, Circuit Judge, and FORD and HEALEY, District Judges.

MAGRUDER, Circuit Judge.

In this complaint New England Telephone and Telegraph Company seeks a decree against the United States of America and the Federal Communications Commission setting aside a certain order of the Commission relating to the manner of keeping accounts of payments by the plaintiff into a Pension Trust Fund for employees. The complaint also asked for a preliminary restraining order, and interlocutory and permanent injunctions, restraining the enforcement of the order in question. Our jurisdiction, which is not challenged by the defendants, is rested on the Urgent Deficiencies Appropriation Act of October 22, 1913, 38 Stat. 219, 220, 28 U.S.C.A. §§ 41 (28), 43–48, as extended and made applicable to orders of the Federal Communications Commission by Sec. 402 (a) of the Communications Act of 1934, 48 Stat. 1093, 47 U.S.C.A. § 402(a). American Telephone & Telegraph Co. v. United States, 1936, 299 U.S. 232, 57 S.Ct. 170, 81 L.Ed. 142.

On May 24, 1943, the defendants filed a motion for summary judgment, together with a supporting affidavit by Mr. Charles R. Denny, general counsel of the Federal Communications Commission, to which was appended the record of the proceedings before the Commission, culminating in its report and order. At the hearing before us on an order directing the defendants to show cause why a preliminary restraining order should not be granted, the plaintiff waived its request for interlocutory relief, and the cause proceeded to full argument on the merits by counsel for the parties, and by counsel for certain intervening labor organizations which claimed that the challenged order of the Commission jeopardized employees' benefits under the Pension Plan. The case was submitted to us for final disposition. See National Broadcasting Co., Inc., v. United States, 1943, 319 U.S. 190, 227, 63 S.Ct. 997, 87 L.Ed. 1344.

On January 1, 1913, the Interstate Commerce Commission, which then had regulatory jurisdiction, made effective the first Uniform System of Accounts for Telephone Companies. Account 672, one of the operating expense sub-accounts, provided:

"672. Relief Department and Pensions.

"This account should include pensions or other benefits paid to employees or representatives of former employees and expense in connection therewith; salaries and expenses incurred in conducting a relief department, and contributions made to such department."

Also on January 1, 1913, the plaintiff and other Bell System companies, of which American Telephone and Telegraph Company is the parent company, established identical pension plans, applicable to all employees, who became eligible for pen

sions thereunder after completing a designated period of service and reaching a designated age. Employees retired under the Plan became entitled for life to an annual pension equal to 1% of their average annual pay for the ten years preceding retirement multiplied by the total number of years of active service. The plaintiff made an initial appropriation of $1,000,000 to a so-called Employees Benefit Fund, which as actually handled was more in the nature of a bookkeeping reserve, not segregated from the other assets of the corporation. Under Sec. 11 of the Plan, the company obligated itself to act as custodian of the Fund, to credit it with interest at the rate of 4% per annum on its average balance, to make payments of pensions out of the Fund pursuant to the Plan, and to add to the Fund at the end of each fiscal year "such amount as will restore it to its original amount, provided that such addition shall in no year exceed 2% of the Company's pay roll." Thus, the financing was in effect on a pay-as-you-go basis. Pensions actually paid in a given year were charged by the plaintiff to operating expense under, and in accordance with, Account 672 as it originally read. At the outset, the company was under no obligation to make advance payments to a fund to provide for the costs of future pensions. Indeed, as an expert witness for the Commission testified, accrual accounting would not have been practicable or permissible under the 1913 plan, because of the 2% limitation on the amount of the plaintiff's contribution and because of the absence of any contractual obligation which would dedicate accruals irrevocably to pension purposes. No employee acquired any rights under the Plan until he attained eligibility for retirement.

Pension costs on the pay-as-you-go basis were small in the early years, but on an ascending curve; and it was evident that after a time the scale of pensions provided in the Plan could not be maintained within the 2% of payroll limitation above mentioned. Studies indicated that with such limitation removed, pension costs on this basis of financing would continue rising eventually to the burdensome level of 12% of payroll. This would be avoided by shifting to an accrual method of financing, under which advance payments to a pension fund would earn interest in the fund and to that extent reduce total charges to operating expenses on account of pension disbursements. Representatives of the Bell System companies made known to the Interstate Commerce Commission their desire to finance their pension costs on an accrual basis. To accommodate Account 672 of the Uniform System of Accounts to the proposed change, the Interstate Commerce Commission added to that account, by amendment on December 19, 1927, the following note:

"Note. If a carrier has definitely undertaken by contract to pay pensions to employees when regularly retired for superannuation and/or disability and has established a fund to be held in trust for such pension purposes, the carrier shall charge to this account monthly amounts determined through the application of equitable actuarial factors to the current payrolls, which, together with interest accruals on the trust funds, will as nearly as may be provide for the payment of such pensions, or for the purchase of annuities corresponding thereto. The amounts so charged shall be concurrently credited to an insurance reserve account under account 170, 'Liability on account of provident funds.' The amounts accrued in each year shall correspond to the aggregate of the amounts paid into the trust fund and expended directly by the Company for pensions or annuities during the year. The carrier shall maintain a complete record of the actuarial computations through which the accrual each month of its pension liabilities is established.

"Upon the adoption of the accrual plan of accounting, pension payments to employees retired before the adoption of such plan shall be charged to an existing pension reserve or to profit and loss.

"Before adopting the accrual plan of accounting for pensions the carrier shall inform the Commission of the details of its pension plan giving full statement of the facts which in its judgment establishes a contractual obligation for pension payments together with the actuarial formula under which it proposes to create its pension trust fund, and also a copy of the declaration of trust under which the fund is established.

"No charge to this account shall be made in anticipation of discretionary pension payments in the future."

Accordingly, the plaintiff and other Bell System companies amended their pension plans, the plaintiff as of October 1, 1927, and the other companies as of January 1, 1927. The 2% of payroll limitation was

eliminated. A Pension Trust Fund was established, with the Bankers Trust Company as trustee. All payments into the Trust Fund under the new accrual method of financing were irrevocably dedicated to pension purposes. In the 1928 reprint of its revised Pension Plan the plaintiff's new undertaking was set forth in Sec. 4, paragraph 8, as follows:

"(8) In order to meet its obligations to pay service pensions (defined in Paragraphs 1(a) and 1(b) of this Section) granted to take effect under the Plan, the Company, effective October 1927, established a trust fund to be known as the 'Pension Fund.' It undertakes to maintain this Fund by periodic charges to operating expenses and payments to the Fund in such amounts that when an employee becomes eligible under the Plan to receive a service pension, there will be available in the Pension Fund an amount sufficient to provide for him a pension in the amount stated in the Plan. It has also made adequate provision in the Pension Fund for the payment of all service pensions granted under the Plan to take effect prior to October 1, 1927. The Pension Fund shall be held by a trustee or trustees for service pension purposes only and shall be disbursed as directed by the Company from time to time. In case of termination of the Plan, or in case of revocation or other termination of any trust agreement for service pension purposes executed under the Plan, the Company undertakes to preserve the integrity of the Pension Fund as a trust fund to be applied solely to service pension purposes and to take such action as may be necessary or appropriate to insure the application of the entire fund to such purposes. All service pensions granted to take effect under the Plan shall be paid from the Pension Fund."

The revised Account 672 having provided that upon the adoption of an accrual plan of accounting "pension payments to employees retired before the adoption of such plan shall be charged to an existing pension reserve or to profit and loss," the funds to continue the payment after October 1,1927, of pensions to the employees of the plaintiff retired prior to that date were not charged to operating expense, but were drawn from an existing reserve, the Employees Benefit Fund. The advance payments to be made to the newly established Pension Trust Fund were therefore designed to meet future pension costs in respect only of employees to be retired after October 1, 1927.

In its complaint the plaintiff alleges: "No employee has any right to a pension or any claim against the Pension Fund until his retirement after he has completed the length of service and attained the age specified in the Plan. The Plan is and ever since its adoption has been terminable at any time by plaintiff, but not in such a way as to deprive any individual of pension benefits to which he theretofore may have become entitled." This appears to be an accurate statement, and we do not understand that it is challenged by the Commission. But expectations have been aroused by the operation of the Plan for over thirty years, and the company has had the fixed policy of safeguarding and maintaining it for the long future, a policy dictated by considerations both of moral obligation and business prudence.

At first, the plaintiff's accrual payments into the Pension Trust Fund were computed upon the so-called fifteen-year service basis, expressed by resolution of its board of directors, dated December 28, 1927, as follows: "For employees with fifteen years or more of service there shall be charged to operating expenses and paid into said Pension Fund for the quarter starting October 1, 1927, and each year thereafter, amounts which actuarially determined and with allowance for interest accretions will produce at the times such employees become eligible to retire on pension at their own request under said Plan, the full estimated present worth of the service pensions to which they are then entitled."

Since this accrual formula was soon superseded, we need not discuss in detail its actuarial components. In brief, it was designed to spread pension costs in respect of a particular group of employees as a flat percentage of the payroll of that group from and after the completion of its first fifteen years of service. If this formula had been adhered to, the payments to be made into the Pension Trust Fund would have had to be recomputed each year to take in a new group completing fifteen years of service, with the result that the accrual rate, while it would have been a level percentage of the payroll applicable to employees with more than fifteen years of service, would have increased in relation to total payroll, since as time went on,

the payroll applicable to this group of employees would constitute an increasing proportion of the total payroll. Continued accruals on this basis would not have provided fully for the costs of future pensions, assuming the Pension Plan to remain in effect indefinitely, because on October 1, 1927, the plaintiff had a large group of employees with more than fifteen years of service. As explained by a witness for the plaintiff: "In the determination of 1927 accrual charges the resulting level accrual rates were applied not only to the payroll of those employees who had just completed fifteen years of service, but also to the payroll of employees at higher terms of service. For the latter groups, considered separately, the continuation of this accrual program obviously would not have provided fully for the payment of future pensions, since the accrual rates used were determined on the assumption that they would be applied from and after the completion of fifteen years of service, whereas the majority of employees whose wages were included in the accrual base had long since passed that point in service. The adoption of the 'fifteen-year' basis of accruals therefore involved what in actuarial terminology is known as an initial 'accrued actuarial liability.'" This deficiency, computed as of October 1, 1927, was approximately $10,500,000, the sum which, at the time the accrual plan was inaugurated, would theretofore have been accumulated to the credit of the Fund, in respect of active employees with over fifteen years of service, if the fifteen-year service basis of accrual had previously been in effect.

During 1928 the plaintiff paid into the Pension Trust Fund and charged to Account 672 a total of $1,090,770. Pensions actually paid to retired employees during that year amounted to $132,374, or 0.4% of payroll.

Effective January 1, 1929, the plaintiff, following the lead of other Bell System companies, changed over to the so-called "full-service basis" for computing the annual payments to the Fund. This formula for determining the accrual rate involves the following computations:

A. Estimate of present worth of future pensions under the Plan to group of employees entering the service at the same time, computed as of the date of their entry into employment.

B. Estimate of present worth of future wage payments to the group computed as of the date of entry into service.

C. Full-service accrual rate applicable to the group, A÷B. Full-service accrual rates are determined separately for various groups of entering employees classified according to sex and age at entry. The composite rate for the company as a whole is determined by weighting the separate group rates by the corresponding distribution of the company's payroll by sex and age at entry. This formula develops an approximately even percentage of payroll which, if applied with respect to all employees from the time of their first entry into service, will provide for all the costs of future pensions. The accuracy of the computation depends, of course, upon the validity of the underlying actuarial assumptions as to future rates of separation from service before attaining eligibility for retirement on pension, future wage payments, longevity, interest rates, etc.

However, accruals to the credit of the Pension Trust Fund starting in January, 1929, on the full-service basis, would not provide for all the costs of expected future pensions, because a large number of employees had been in service prior to 1929. The deficiency, as of January 1, 1929, amounted to $18,085,263, computed by taking the difference between (1) the present worth of the estimated future pensions under the Plan, and (2) the total in the Fund plus the present worth of future payments into the Fund at the full-service accrual rate. This amount, which the Commission terms the "unfunded actuarial liability" and which the plaintiff prefers to call the "unfunded actuarial reserve requirement," if it had been put into the Fund on January 1, 1929, would have so increased the earnings of the Fund that, upon the assumptions involved in the calculations, the future accruals at the full-service accrual rate would have provided for all pension costs over the future.

The existence of this "unfunded actuarial liability" did not mean that the plaintiff was at any time delinquent in fulfilling its strictly legal obligations as set forth in the Plan. It is to be noted that under Sec 4, paragraph 8, of the amended Pension Plan, above quoted, the plaintiff was under a legal liability to maintain in the Pension Trust Fund as of any particular date only so much as would be necessary to pay all the future pensions of those

employees who had either retired or had become eligible to retire on that date. Accruals on the fifteen-year service basis, and on the full-service basis (which remained in effect until 1937, as we shall subsequently see), each produced more than enough payments into the Fund to satisfy the existing legal obligations of the plaintiff under the Plan, as is apparent from the following table, appended to the complaint as Exhibit B:

determine whether a given item should be entered under a particular account. Section 220(g) provides that "it shall be unlawful for such person to keep any other accounts, records, or memoranda than those so prescribed or such as may be approved by the Commission or to keep the accounts in any other manner than that prescribed or approved by the Commission." Furthermore, Sec. 220(c) provides that: "The burden of proof to

SERVICE PENSION DATA

NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY

| | Disbursements for service pensions | | Accruals for service pensions | | Unfunded actuarial reserve requirement at end of year | Balance in Pension Trust Fund at end of year | Amount Plaintiff obligated to have in Fund at end of year |
|---|---|---|---|---|---|---|---|
| Year | Amount | % of Payroll | Amount | % of Payroll | | | |
| 1928 | $132,374 | 0.4% | $1,090,770 | 3.4% | $18,085,263 | $3,224,790 | $2,881,372 |
| 1929 | 152,081 | 0.5 | 818,723 | 2.4 | 19,322,806 | 4,080,318 | 3,234,746 |
| 1930 | 194,251 | 0.5 | 921,869 | 2.6 | 20,871,534 | 5,093,173 | 3,693,615 |
| 1931 | 244,889 | 0.7 | 940,057 | 2.7 | 21,276,026 | 6,100,166 | 4,344,106 |
| 1932 | 273,346 | 0.8 | 900,801 | 2.7 | 21,659,814 | 7,048,114 | 4,991,131 |
| 1933 | 343,777 | 1.1 | 835,104 | 2.7 | 23,105,987 | 7,829,657 | 6,065,919 |
| 1934 | 487,373 | 1.6 | 811,765 | 2.7 | 24,478,131 | 8,473,706 | 6,956,038 |
| 1935 | 506,762 | 1.7 | 815,021 | 2.7 | 25,571,128 | 9,127,415 | 7,709,332 |
| 1936 | 541,716 | 1.8 | 826,547 | 2.7 | 24,565,217 | 9,783,853 | 8,524,005 |
| 1937 | 580,439 | 1.7 | 1,607,581 | 4.8* | 24,810,869 | 11,213,517 | 9,415,579 |
| 1938 | 637,928 | 1.8 | 1,915,382 | 5.5 | 24,810,869 | 12,900,883 | 10,582,583 |
| 1939 | 718,836 | 2.1 | 1,894,314 | 5.5 | 24,810,869 | 14,530,815 | 12,147,941 |
| 1940 | 755,205 | 2.2 | 2,577,959 | 7.5** | 24,810,869 | 16,842,924 | 13,372,318 |
| 1941 | 812,154 | 2.2 | 2,736,456 | 7.5 | 24,810,869 | 19,309,810 | 14,605,055 |
| 1942 | 849,665 | 2.2 | 2,957,143# | 7.5 | 24,810,869 | 22,173,439 | 15,644,398 |

*At rate of 2.4% for first quarter and 5.5% for last three quarters.

**Of this amount $998,874 was charged under protest to income.

\# The percentage was increased in 1940 because experience required revision of certain actuarial factors. Approximately one-half of the increase was due to a reduction of the interest rate assumed in the actuarial calculations from 4% to 3½%.

The Communications Act of 1934, 48 Stat. 1064, 47 U.S.C.A. § 151 et seq., transferred to the Federal Communications Commission regulatory jurisdiction over telephone companies. Section 220(a) of the Act, 47 U.S.C.A. § 220(a) provides that: "The Commission may, in its discretion, prescribe the forms of any and all accounts, records, and memoranda to be kept by carriers subject to this Act, including the accounts, records, and memoranda of the movement of traffic, as well as of the receipts and expenditures of moneys." Not only is the Commission authorized to prescribe "the forms of any and all accounts"; it also has power to supervise the accounting performed under the prescribed system of accounts, and to

justify every accounting entry questioned by the Commission shall be on the person making, authorizing, or requiring such entry and the Commission may suspend a charge or credit pending submission of proof by such person." And see Norfolk & Western Ry. Co. v. United States, 1932, 287 U.S. 134, 53 S.Ct. 52, 77 L.Ed. 218. When the Federal Communications Commission promulgated its Uniform System of Accounts for Telephone Companies in 1935, it adopted without substantial change, so far as the present litigation is concerned, the provisions of Account 672 as in the earlier regulations of the Interstate Commerce Commission. The full text of Account 672 as it now reads is copied in the footnote.[1]

[1] "(a) This account shall include pensions or other benefits paid to active and retired employees, their representatives or beneficiaries, and salaries and expenses incurred in conducting relief, benefit, and general medical departments.

The plaintiff and the other companies in the Bell System, during the years in which they made accruals on the full-service basis, continued their studies as to the best method of dealing with the unfunded actuarial reserve requirement, which continued to increase after January 1, 1929, because the lack of accruals on the full-service basis prior to that date deprived the Fund of the annual compound interest which the omitted accruals would have earned. An analysis of the plaintiff's pension situation indicated that if the full-service accrual program and the experience thereunder continued at the levels then prevailing, annual disbursements for pensions would exceed full-service accruals in 1940, and in 1944 would exceed full-service accruals plus interest earnings of the Pension Fund. Thereafter, the balance in the Pension Fund would begin to decline, and would be completely exhausted in 1955.

In 1937 the plaintiff, and six other Bell System companies, stepped up their accrual rate to a level estimated to be sufficient, with interest earnings in the Fund, to provide for all future pension costs. The plaintiff's board of directors voted an annual accrual rate of 5.5% of payroll, actually arrived at in this way:

(1) Take 4% of the amount of the unfunded actuarial reserve requirement, computed as of December 31, 1936, when the full-service accrual program was in effect.

It shall include payments to or on behalf of employees on account of injuries or accidental death when such payments come within the scope of a company's general provision for employees' benefits.

"(b) If the company has definitely undertaken by contract to pay pensions to employees when regularly retired for superannuation or disability and has established a fund to be held in trust for such pension purposes, the company shall charge to this account monthly amounts determined through the application of equitable actuarial factors to the current payrolls, which, together with interest accruals on the trust funds, will as nearly as may be, provide for the payment of such pensions, or for the purchase of annuities corresponding thereto. The amounts so charged shall be concurrently credited to a separate subaccount under Account 170, 'Provident reserve.' The amounts accrued in each year shall correspond to the aggregate of the amounts expended directly by the company for pensions or annuities during the year and amounts paid into the trust fund. The company shall maintain a complete record of the actuarial computations through which the accrual each month of its pension liabilities is established.

"(c) Upon the adoption of the accrual plan of accounting, pension payments to employees retired before the adoption of such plan shall be charged to an existing pension reserve or to Account 413, 'Miscellaneous debits to surplus.' If a company pays into its pension trust fund the amount of its existing pension reserve, any such amounts in excess of provision for pensions granted prior to the adoption of the accrual plan may be applied in whole or in part to the adjustment of future accrual changes.

"(d) Before adopting the accrual plan of accounting for pensions the company shall inform this Commission of the details of its pension plan giving full statement of the facts which in its judgment establish a contractual obligation for pension payments together with the actuarial formula under which it proposes to create its pension trust fund, and also a copy of the declaration of trust under which the fund is established. Each company that has adopted the accrual plan of accounting for pensions shall make no change in the accounting therefor or in the method of computing the amounts of the accruals recorded in the accounts under the plan without first submitting full particulars of the proposed changes and a detailed statement of the reasons therefor to this Commission for its consideration and approval.

"(e) No charges to this account shall be made in anticipation of discretionary pension payments in the future.

"(f) This account shall include also, under a separate subaccount, amounts accrued to provide for the payment of termination allowances or similar benefits to employees of the company when such employees are laid off because of lack of work, and to provide necessary and warranted relief to former employees. Charges to this subaccount shall be made only after approval by this Commission of the company's plan for administering payments for these purposes and of the amount of the accruals. Amounts charged to this subaccount shall be concurrently credited to Account 173, 'Employment stabilization reserve.'

"(g) There shall be credited to this account that portion of each class of relief and pensions assigned to construction and custom work labor."

The resulting product represents the additional amount to be added annually to the Fund.

(2) Apply the full-service accrual rate to the total census payroll. The resulting product represents the annual normal accrual on the full-service basis.

(3) Add amounts (1) and (2) to get the total annual accrual.

(4) Translate this combined amount into a percentage of total census payroll.

(5) The resulting rate of approximately 5.5% was to be the level accrual rate applicable in the future to current payrolls, subject to necessary recomputation from time to time on account of changes in actuarial factors.

There would thus be added annually to the Pension Fund, in addition to the amount of the normal accrual, payments equivalent to the earnings (at the assumed rate of 4%) which would have been produced on the amount of the unfunded actuarial reserve requirement if that amount had then been in the Fund. It was proposed to charge the whole amount of the accruals at the rate of 5.5% of payroll as a single item in Account 672.

The application of this new level accrual rate would not eventually result in putting into the principal of the Pension Fund an amount equal to the estimated unfunded actuarial reserve requirement as it existed under the full-service accrual basis of financing. Another way to put it is to say that the stepped-up accrual rate established in 1937 arrested the growth of, but did not amortize, the unfunded actuarial reserve requirement. But this would not be necessary in order to provide for all future pension payments, if the assumption were made that the Pension Plan would continue in force indefinitely and that the plaintiff's business would either continue at its present level in future years or increase in volume.

Commencing as of April 1, 1937,[2] the plaintiff's payments into the Pension Fund were increased. In 1937 such payments totalled $1,607,581, which the plaintiff charged to Account 672, as against $826,-547 in 1936.

The Commission promptly challenged the propriety of charging to operating expenses under Account 672 the increases over the normal accruals theretofore made on the full-service accrual basis. Lengthy correspondence and conferences ensued between representatives of the Commission and the American Telephone and Telegraph Company. On May 11, 1938, the Commission granted the request of the companies for a formal hearing by an order providing that "the matters to be considered at the hearing shall be limited strictly to the propriety of including in Operating Expense Account No. 672, for the year 1937 and thereafter, any amount representing any portion of the unfunded actuarial liability of any of the companies named, including interest on such unfunded actuarial liability." The order was served on the plaintiff and the six other Bell System companies whose accounting entries were in issue, also on American Telephone and Telegraph Company, the National Association of Railroad and Utility Commissioners, and the various state public utilities commissions.

Extensive hearings were held by an examiner in September and October, 1938, and a voluminous record was made. On December 11, 1941, the Commission issued its proposed report in which it was concluded that the companies had failed to justify the accounting entries in question. Subsequently, the Commission granted leave to intervene, to sixteen other Bell System companies[3] and to various labor organizations, for the purpose of filing exceptions to the proposed report and presenting oral argument thereon. Exceptions and briefs were filed by the parties and intervenors, and on May 8, 1942, the Commission heard oral argument. On December 2, 1942, the Commission issued its final report and order.

That order, which is now under review, provided: "That all charges to Account 672, 'Relief and pensions,' of the Commission's Uniform System of Accounts for Class A and Class B Telephone Companies, made by the New England Telephone and Telegraph Company, The Diamond State Telephone Company, The Chesapeake and Potomac Telephone Company of Virginia, The Chesapeake and Potomac Telephone Company of Baltimore City, The Pacific Telephone and Telegraph Company, the Southern California Telephone Company, and the Bell Telephone Company of

[2] The other six companies made the change as of January 1, 1937.
[3] These companies had not begun to increase their accruals so as to "arrest" the growth of the unfunded actuarial liability until 1941.

Nevada on and after January 1, 1942 to date, which have been found in said Report of the Commission issued this day in this proceeding not to be properly includible in said Account 672, shall be eliminated from said Account, and such companies shall cease and desist from making any such charges to Account 672; * * *"

The report, which the Commission incorporated by reference in its order, assumed for the purpose of this proceeding, without conceding, that the plaintiff's pension plan as revised in 1927 complied with Account 672(b) in respect to the requisite of a contractual undertaking. It was not denied that the plaintiff had established a trust fund for pension purposes. There was no finding that the accruals proposed to be charged to Account 672 were in excess of the amounts necessary to provide for expected future pension payments under the plan. No question was raised as to the propriety of charging to Account 672 the normal accruals on the full-service basis, as had been done by the companies since 1928.

As to the so-called "arresting" items which the companies proposed to add to the accruals in 1937, the Commission found "that they represent a portion of pension costs properly allocable to past fiscal periods, and that, therefore, they should not be charged to any current operating expense account". Specifically, the Commission found that the arresting items are not appropriately chargeable to Account 672, since they are not determined "through the application of equitable actuarial factors to the current pay rolls" within the meaning of Account 672(b), but, rather, "are determined by the application of an interest rate to the unfunded actuarial liability, and are thus computed by a simple mathematical process which is wholly independent of current pay rolls."

Again, the report stated: "The unfunded actuarial liability represents pension costs properly applicable to past fiscal periods, and the amounts designed to arrest the growth of this actuarial deficiency are in the nature of delayed, rather than current, items. Accordingly, they should not

be included in any of the operating expense accounts, which, as stated in Instruction 60 of the Uniform System of Accounts, 'are designed to show the expenses of furnishing telephone service.' As such delayed items, these amounts would seriously distort operating expense Account 672 if included therein, and therefore are not properly chargeable to such Account under the provisions of Instruction 5 of the Uniform System of Accounts * * *." 4

The report seems to imply that, on correct accounting principles, charges to current operating expenses of accrual payments to meet the cost of future pensions should never exceed the normal accruals on a full-service basis, which allocates pension costs by even accruals throughout the entire period of service, from the beginning of employment to the time of retirement. Thus, even if the plaintiff had adopted accrual financing at the introduction of its Pension Plan in 1913, it still could not have charged to operating expenses the full cost of future pensions. In the Commission's view, there would have been some "unfunded actuarial liability," even in 1913, representing a "portion of pension costs properly allocable to past fiscal periods"; thus, the plaintiff could have charged all the costs of pensions to operating expenses only if it had established the Pension Plan, full blown, when it started in business, at some date prior to 1913, with provision then made for annual accruals on the full-service basis irrevocably dedicated to pension payments.

In answer to the contention that the Commission's order might impair the ability of the companies to meet future pension payments and to continue their pension plans, the report stated: "Such contentions rest on the unfounded assumption that a disposition is now being made which will diminish the companies' revenues and deplete the balances in their surplus and income accounts. It is clear, however, that any charge to operating expenses is an indirect deduction from income or surplus. Other factors being equal, the companies' surplus will be the same whether the amounts in question are

4 Instruction 5 reads: "If the amount of any delayed item is relatively so large that its inclusion in the accounts for a single year would seriously distort those accounts, the company shall distribute to surplus so much of the amount as af-

fects the operations of prior years. The company shall file with this Commission the full particulars concerning each such item, including the accounts and years which would have been affected had the item not been delayed."

charged directly to income or surplus accounts or are deducted indirectly from income or surplus by being charged to operating expenses.[5] This is an accounting case, not a rate case, and the issues before us are those which deal with the proper form of accounting and the applicability of accounting rules, rather than those which may involve the propriety of any given rate. We conclude, therefore, that no injury can reasonably befall employees as a result of the Commission's decision herein."

The primary purpose of establishing a pension plan is to deal in an orderly way with the problem of superannuation. The costs of superannuation have to be met by the business in some way. In the absence of provision for retirement of employees on a fair pension, experience has shown the inevitable result to be that employees are kept on the payroll after their usefulness has been impaired, the promotion of younger and more vigorous employees is delayed, and there is a general lowering of efficiency in the conduct of the business. Management does not find it practicable to pursue the cold-blooded policy of laying off faithful old employees as soon as their inefficiency is manifest, unless some financial provision is made for them. The costs of superannuation are thus borne by the business, in more or less disguised form, in the absence of a pension plan. Systematic retirement on pension results in removing superannuated employees from the payroll and in improving the morale and efficiency of the younger employees, who thus have an added incentive for remaining in the service of the company. The adoption of a pension plan substitutes a new type of expense, namely, pension costs, for the expense, not so easily measurable in dollars and cents, which must somehow be borne by the business in the absence of an orderly handling of the superannuation problem. It is widely believed that this substituted expense results, on the whole, in a net gain for the company.

Therefore, the costs of maintaining a fair and reasonable pension plan constitute a justifiable business expenditure. A pension plan would not be fair and adequate and would not achieve its full purpose if employees who were near the retirement age at the time of its adoption had their pensions cut in proportion to the shortness of their active service subsequent to the adoption of the plan. Accordingly it is a common practice to determine retirement benefits in part by the factor of total length of service, and further to provide that a certain flat minimum pension allowance shall be made if the generally applicable formula for determining pension benefits does not provide an adequate pension. These features are present in the plaintiff's Plan.

Since the benefits which the company obtains by the establishment of a pension plan necessarily accrue after the plan is put in operation, and since these benefits are the justification for incurring pension costs, it would seem that the whole of the costs of future pensions under a reasonable pension plan may legitimately be regarded as operating expenses, allocable to the period subsequent to the adoption of the Plan. As stated above, the plaintiff adopted a revised Pension Plan in 1927, removing the 2% payroll limitation, introducing a new contractual undertaking and establishing a trust fund irrevocably dedicated to pension purposes. The new plan provided exclusively for pensions to persons retired after the date of its adoption. The benefits to the company from the revised Plan accrued from and after October 1, 1927. Since no question is raised as to the reasonableness of the amounts of pensions provided in the revised Plan, it would seem to follow that the total cost of future pensions to be paid under it is a justifiable expense properly allocable to the period subsequent to October 1, 1927.

As of that date the company started out with what the Commission calls an "unfunded actuarial liability" of about $10,500,-000. This phrase, and similar phrases, though in common usage, are somewhat misleading. The plaintiff had no such liability on that date either in a legal or an accounting sense. The phrase is merely an

---

[5] In compliance with the Commission's order the companies under protest lifted the charges in question out of Account 672 and charged them to income sub-account 323, a miscellaneous account which includes "all items not provided for elsewhere properly chargeable to income."

The Commission's brief states that the Commission "permitted this accounting in view of the current trend in accepted accounting practice to transfer to the income statement substantially all items previously reflected in the surplus statement."

actuarial expression for the estimate of the portion of the present worth of total future pension payments under the Plan. which is not funded as of a given time and which will not be provided for under a particular accrual program. Even as of a given date the "unfunded actuarial liability" will vary with a variation of the current accrual program. It appears, for instance, from Exhibit F that as of January 1, 1927, the accrued actuarial liability for all the Bell System companies was $60,000,000 on the fifteen-year basis of accrual, and $160,000,000 on the full-service basis of accrual. If on that date the companies had adopted a long-range accrual program sufficient to cover all the costs of estimated future pensions, the "unfunded actuarial liability" would have evaporated like the morning mist.

Account 672, as revised by the Interstate Commerce Commission in 1927 and as continued in effect by the Federal Communications Commission, clearly permits a company, under given conditions, to charge to operating expenses the full amount of periodic accruals paid into a trust fund which, together with accumulating interest on the fund, are necessary to provide for the payment of all future pensions to employees retired after the fund is established. The crucial language is: " * * * the company shall charge to this account monthly amounts determined through the application of equitable actuarial factors to current payrolls, which, together with interest accruals on the trust funds, will as nearly as may be, provide for the payment of such pensions. * * *" Suppose the plaintiff on October 1, 1927, had adopted an accrual program adequate to provide fully for the cost of future pensions. It would not have had to compute separately an accrual rate on the full-service basis, and then add to that a further accrual rate designed to arrest the further growth of an unfunded actuarial liability. In the case supposed, there would not have been any unfunded actuarial liability to worry about, for the reason already explained above. The actuary would have estimated (1) the present worth of all future pension payments under the Plan. Then (2) the amount initially placed in the Pension Fund would have been subtracted, to arrive at (3) a figure representing the portion of the present worth of future pension payments which would have to be provided by future accruals. The actuary would then have made (4) an estimate of the present worth of future payrolls. Finally, to determine the level accrual rate which when applied to future payrolls would produce in the Pension Fund an amount sufficient to provide for all future pension payments, he would (5) have divided (3) by (4). A level accrual rate so determined would have been, without doubt, the product of "equitable actuarial factors." This rate, when applied to current payrolls, would have produced monthly amounts which, together with accumulating interest in the Pension Fund, would have provided for the payment of future pensions "as nearly as may be"—that is, subject to the normal margin of error in actuarial assumptions. Such accruals, in full, would have been chargeable periodically to Account 672.

But the plaintiff started its accrual program in 1927 on the fifteen-year service basis, and from 1929 to 1937 made accruals on the full-service basis, neither of which was actuarially sufficient to provide fully for future pensions. It was not until 1937 that the plaintiff undertook to establish a level accrual rate sufficient to provide for all future pensions. The simplest way in 1937 to calculate such a level accrual rate was to take the going full-service accrual rate and add to it a further rate designed to arrest the growth of the unfunded actuarial reserve requirement. The augmented accrual payments which the plaintiff on April 1, 1937, commenced to charge to Account 672 were not, as the Commission thought, made up of unrelated components, one derived from the application of actuarial factors to current payrolls, and the other a simple mathematical calculation of interest at 4% upon a fixed amount, namely, the unfunded actuarial liability as of a given date. Such a view is an oversimplification. The assumed rate of interest is itself one of the common actuarial factors; furthermore, the unfunded actuarial liability is itself the product of actuarial estimates, and is subject to revision upwards or downwards from time to time to the extent that the test of experience fails to confirm the actuarial assumptions.[6] As we have already in-

6 At the oral argument counsel for the Commission conceded that to the extent that the unfunded actuarial liability as of December 31, 1937, was thereafter increased because of necessary revision of actuarial estimates to conform to actual

dicated in discussing the complete accrual program which might have been put into effect in 1927, the level accrual rate of 5.5% might have been arrived at in 1937 by a method of computation which involved no use of an interest factor applied to the unfunded actuarial liability and no separate computation of a so-called normal accrual rate on the full-service basis. But the method by which the calculation was made is not important. The composite accrual rate fixed by the company in 1937 is clearly, we think, an actuarial factor (or a rate derived from actuarial factors) which, when applied to current payrolls, will determine the amount of periodic accruals into the Trust Fund needed to provide for the payment of future pensions.

If the plaintiff, instead of waiting ten years after the promulgation of its revised Pension Plan in 1927, had embarked in 1927 on an accrual program actuarially sufficient to provide fully for future pensions, the annual charges to operating expenses under Account 672 would have been very considerably smaller than the proposed charges under the complete accrual program introduced in 1937. The Commission argues that if the plaintiff's position in this case is sustained, the plaintiff might just as well have elected to wait until 1947, or later, to institute the augmented accrual program, and thus could have swollen to even greater proportions the subsequent operating expense charges which, as a witness for the Commission testified, the telephone companies "proposed to hold control of in a reservoir, the escape valve of which lies entirely in their own hands to be opened at such times as they deem advisable". Since operating expenses are an important element in the determination of rates to be charged for the telephone service, it is argued that this might result, in a later period, in throwing upon the then current users of the telephone service a disproportionate burden of the pension costs.

On the other hand, the plaintiff argues that in accounting theory and practice there is no one accepted method of accrual to cover the costs of future pensions; that it depends largely upon the circumstances of the particular business, as to which the judgment of the board of directors, within reasonable limits, should be conclusive; that as the benefits derived by the company from a pension plan increase as a greater proportion of the employees approach the retirement age, it is rational to follow a step rate accrual program which in the later years makes a somewhat higher charge to operating expenses than in the earlier years of the operation of the Plan.

It is not in this court's province to pass on the respective merits of these opposing views. The scope of our review of Commission orders affecting the manner of keeping accounts is a very restricted one, as the Supreme Court has pointed out. Norfolk & Western Ry. Co. v. United States, 1932, 287 U.S. 134, 141–143, 53 S. Ct. 52, 77 L.Ed. 218; American Telephone & Telegraph Co. v. United States, 1936, 299 U.S. 232, 236, 237, 57 S.Ct. 170, 81 L.Ed. 142. See also Northwestern Electric Co. v. Federal Power Commission, 9 Cir., 1942, 125 F.2d 882, 885; Alabama Power Co. v. Federal Power Commission, 1942, 75 U.S. App.D.C. 315, 128 F.2d 280, 289, 290. Account 672, as revised in 1927, and continued in effect by the Federal Communications Commission, seems to contemplate a level accrual rate "as nearly as may be," that is, subject to subsequent revision from time to time as the actuarial assumptions underlying the rate are invalidated by the test of experience.[7] We cannot say that such an accounting requirement is so arbitrary and outrageous, so entirely at odds with the fundamental principles of correct accounting, "as to be the expression of a whim rather than an exercise of judgment." American Telephone & Telegraph Co. v. United States, supra [299 U.S. 232, 57 S. Ct. 172, 81 L.Ed. 142].

experience, the plaintiff was entitled to step up the accrual rate sufficiently to arrest or amortize such increase and to make a corresponding charge to Account 672. This would result, of course, in a composite accrual rate somewhat in excess of the normal accrual rate on the full-service basis. Such a composite accrual rate is no more, and no less, an actuarial factor to be applied to current payrolls than the level accrual rate of 5.5% adopted by the plaintiff in 1937.

[7] This is not to say that the Commission has dictated the program of financing pension costs, a matter within the discretion of the board of directors. The companies, if they choose, may still finance pension costs by a step rate accrual program; all that the Commission does is to prescribe the extent to which the companies may charge such accruals to current operating expenses under Account 672.

It therefore follows that under Account 672 as written the plaintiff could have begun in 1927 to make monthly charges to that account at a level accrual rate actuarially sufficient to provide fully for future pensions, but having failed to do so, it could not at a later date so load the charges to that account as to make up for the actuarial deficiency resulting from such failure. For purposes of further charges to Account 672, this accrued deficiency must be treated as though it had been paid into the Pension Fund during the period from 1927 to 1937. From April 1, 1937, the plaintiff was entitled to charge to Account 672 monthly accrual payments at a level rate, actuarially determined to be sufficient, together with what would have been the expected future earnings of the Fund if this lag in accruals had not occurred, to provide for all future pension disbursements under the Plan.

To the extent that the Commission's order did not permit this, it would seem to have gone beyond the language of Account 672. But the present is not a proceeding to enforce a statutory penalty for past failure to keep accounts as prescribed in the Uniform System of Accounts, in which the liability of the company would turn upon an interpretation of the language of Account 672. The Commission is empowered to make changes in the prescribed system of accounts, and the order now under review, which is prospective in operation, does in effect prescribe that, in the future, payments to the Pension Fund on account of the so-called "arresting" item shall not be charged to Account 672, or, indeed, to any current operating expense account. At the hearing which preceded the issuance of the order, certain accounting experts testified that in their opinion the accrual payments to arrest the further growth of the unfunded actuarial liability were allocable to past fiscal periods and were not a proper charge to current operating expenses. It appears in the record that officials of the telephone companies were themselves sometimes in doubt whether the arresting payments should be charged to operating expenses or to income or surplus accounts. Under such circumstances, the Commission's order, made after full hearing, argument and deliberation, cannot be held by us to be the mere "expression of a whim rather than an exercise of judgment." It is not enough that we might be in disagreement with the Commission as to the wisdom or propriety of the order, or that we might believe it to be not in accordance with the best accounting practices. Bearing in mind the narrow scope of judicial review of accounting orders under the criterion laid down by the Supreme Court, it is obvious that such orders may be set aside by the courts only in rare and exceptional cases. Cf. De Castro v. Board of Commissioners, 1 Cir., 1943, 136 F.2d 419, 425. We do not believe that this is such a case.

The Commission emphasizes that this is an accounting case, not a rate case. It is understandable that the plaintiff should desire to obtain an advance determination of the status of the payments in question for rate-making purposes, so as to guide its future policy in reference to the Pension Plan. But we know of no way in which such advance determination can be obtained; certainly it cannot be had in the present proceeding. The mere accounting classification of the charges now in question can conclude neither the Commission nor the plaintiff at the hearing of a subsequent rate case. Norfolk & Western Ry. Co. v. United States, supra, 287 U.S. at pages 141, 142, 53 S.Ct. 52, 77 L.Ed. 218; State Corporation Commission v. Wichita Gas Co., 1934, 290 U.S. 561, 569, 54 S.Ct. 321, 78 L.Ed. 500. Even if the Commission had allowed the additional charges to Account 672 begun in 1937 to remain in that account unchallenged, the Commission, in a subsequent rate case, could still have questioned the propriety of treating such payments as current operating expenses, and under Sec. 220(c) of the Act the burden of proof would have been upon the plaintiff to justify such accounting entries. On the other hand, exclusion now from Account 672 of a portion of the charges which the plaintiff seeks to make to that account will not preclude the plaintiff, in a rate case, from making a showing that a step rate accrual was a reasonable method of allocating costs of providing for pension disbursements under the Plan, and that the arresting payments in question should be treated as current operating expenses for rate-making purposes. Our refusal to set aside the Commission's order leaves that question as wide open as before.

The complaint is dismissed.