UNITED STATES STEEL COR-
PORATION

v.

The UNITED STATES.

No. 81–62.

United States Court of Claims.

Oct. 14, 1966.

Scott E. Bohon, New York City, for plaintiff; Orison S. Marden, New York City, attorney of record. Chester Bordeau, Gerald L. Bader, Jr., and White & Case, New York City, of counsel.

Gerson B. Kramer, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant. Isaac D. Benkin, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, and COLLINS, Judges.

DAVIS, Judge.

United States Steel Corporation asks reimbursement of pension expenses of $2,785,493.11 allegedly incurred in performing four cost-plus-fixed-fee contracts for the Department of the Navy during World War II. The required steel fabrication and assembly work was done by the American Bridge Company, a component of U. S. Steel, from 1942 to 1945.[1] With minor exceptions, the Armed Services Board of Contract Appeals denied plaintiff's claim on October 30, 1958.[2] This decision is said to be erroneous when tested by the Wunderlich Act's standards (41 U.S.C. §§ 321–322). For convenience in litigation, the parties have limited their presentation to the allowability of costs under one contract (#NObs–458) and have agreed that the final decision under it will control all four agreements.

About February 21, 1943, the Bureau of Ships and the American Bridge Company formally entered into contract NObs–458. The agreement, dated "as of February 15, 1942", provided for the construction of 40 tank landing ships ("L.S.T.'s"); the period for performance ran from August 1, 1942 to February 28, 1944. Prior to the contract's formal execution, work had been done pursuant to a Letter of Intent, signed on February 15, 1942.

In constructing the landing ships, plaintiff used both its Ambridge, Pennsylvania plant and a Navy shipyard adjoining that plant, which was specially built for World War II production and leased to plaintiff. Sections and parts of the vessels were fabricated at the Ambridge plant (and elsewhere) and moved into the shipyard for assembly in final form. During performance, employment at the Ambridge plant rose from approximately 7,000 employees to a high of almost 9,000 and, eventually, dropped back to some 5,000 in August 1945. The hiring of employees for the shipyard

1. Until 1951, the American Bridge Company was a corporation wholly owned by United States Steel Corporation. In 1952, it was merged into United States Steel; it has since operated as the American Bridge Division of that firm. "Plaintiff" refers to the American Bridge Company, unless otherwise indicated.

2. Plaintiff appealed the initial denial of its claim to the Secretary of the Navy, in March 1946; he referred the dispute to the Navy Board of Contract Appeals, later the ASBCA Navy Panel.

work began in August-October 1942. Total employment there reached a high of 7,623 in May 1944 and dropped to 708 employees in August 1945. The ASBCA found that almost all of the shipyard crew was hired specially for the war mobilization, while many of the plant employees were permanent members of plaintiff's organization. After the war, the shipyard was returned to the Navy.

The formal contract provided that American Bridge would receive a specified fixed-fee plus "allowable costs", as outlined in the contract, for each L.S.T. "Allowable costs" were defined (Article 9(b)) as those incurred in performing "the contract and accepted by the [Navy's] Bureau of Supplies and Accounts as chargeable in accordance with 'Explanation of Principles for Determination of Costs Under Government Contract, War Department—Navy Department' April 1942 * * *." This "Explanation of Principles" is the so-called Green Book, used in a large portion of military CPFF contracts during World War II. Paragraph 4 of the Green Book declared "total cost" to be "the sum of all costs incurred by the contractor incident to and necessary for the performance of the contract and properly chargeable" to it. Paragraph 29 noted that "indirect shop costs include miscellaneous factory expenses not directly attributable to the contract but necessary and incidental to * * *" performance, such as "pensions and retirement payments to factory employees." Paragraph 40 ("Administration and General Corporate Expenses") provided that "the expenses here contemplated are those related to the general management of the business * * *, compris[ing] items of the following nature: * * * Employees' welfare expenses, including the cost of pension and retirement provisions for administrative and office employees." Paragraph 54 defined certain inadmissible costs;

Number 66 excluded costs clearly unrelated to Government work; and Number 67 provided for apportionment of the "remaining items" on "the most equitable basis".

During the contract period, the employees of American Bridge, then United States Steel's wholly-owned subsidiary, were covered by the single, company-wide pension plan (which originated in 1911) of the parent corporation. The version of the plan effective in 1942–1945 had been adopted by United States Steel's Board of Directors in December 1942, as of January 1, 1942, and was set forth in a booklet of December 1943.[3] This 1942 Pension Plan provided both noncontributory (employer financing only) and contributory (including employee contributions) pensions for superannuation (i. e., old age or longevity), disability, and shutdown of facilities. It incorporated, for certain employees, two pension financing methods set up in prior years, and it also established, for the first time, a means of financing pension reserves ("funding") concurrently with the rendering of services by employees eligible for benefits. In all, four separate types of financing were provided—referred to throughout this litigation as Parts I, II, III, and IV pension costs.

*Part I:* Part I costs related solely to employees retired prior to 1940. From its inception in 1911 until 1940, the United States Steel pension plan was maintained wholly on a cash disbursement basis. Neither American Bridge nor its employees made any contributions to a pension fund during the period pension credits were being earned. Rather, the annual pension payments due to retired workers were paid and charged as a deductible cost for the year in which actually made. Under the 1942 Pension Plan, this procedure was continued with respect to pre-1940 pensioners; as to them, therefore, the 1942 Plan was entirely "pay-as-you-go".

---

3. As did the ASBCA, we refer to this version as the "1942 Pension Plan", since (as pointed out infra) its adoption was prompted by a 1942 Internal Revenue Code amendment.

Plaintiff allocated $146,546.10 of these costs to Navy contract NObs–458.

*Part II:* In 1940, the original pension plan was modified to establish a method of "terminal funding" of the pensions for employees retiring for age or disability after December 31, 1939. Under this change, American Bridge paid to a pension trustee a lump sum (determined actuarially) which was equivalent to the then present value of an annuity sufficient to provide the fixed monthly pension to employees currently retiring for age or disability. These contributions were carried into the 1942 Plan as the Part II payments; they, too, were charged as an expense for the year in which actually made. American Bridge prorated $172,798.55 of costs of this type to its contract.

*Part III:* In October 1942, Congress amended the 1939 Internal Revenue Code with respect to pensions, and the company again reconsidered the subject of pension financing. Since United States Steel had not been financing pensions prior to the retirement of eligible employees, it had in 1942 a large accrued, but unpaid and unfunded, pension liability resulting from pension credits which employees still in the company's service had earned over the years, i. e., a "past service" liability.[4] A study conducted by an independent actuary for United States Steel ascertained that, as of December 31, 1942, American Bridge's unfunded past service liability with regard to current employees was more than $3½ million. Since the 1942 revenue amendments permitted the funding of such liability to be charged, for tax purposes, as a current expense at a considerably greater rate than previously allowed, U. S. Steel amended its pension plan to fit the new Act's authorization. This additional funding of "past service" pension costs related only to employees to be retired in the future (after December 31, 1942). Payments made by the company under this program are the Part III pension costs.

The annual amount of these Part III contributions depended ultimately on the size of the maximum tax deduction allowed by the amended Internal Revenue Code (§ 23(p) (1) (A) (i)). The deduction for total pension funding expenses could not exceed 5% of the payroll of employees eligible for pensions. On the basis of its actuary's reports, American Bridge treated 90% of all its employees as eligible to participate in the 1942 Pension Plan, and it took as a tax deduction for its total pension costs (Parts I through IV) the full 5% of the eligible payroll (or 4½% of its total payroll). To determine the amount of its Part III pension costs, the company first computed the sum of (i) its cash disbursements paid to employees retired prior to December 31, 1939 (the Part I payments), (ii) its terminal funding lump-sum contributions (the Part II payments), and (iii) its payments under the employee-contributory part of the pension plan (Part IV).[5] It then sub-

---

4. "Pensions are commonly spoken of as *'accruing'* contemporaneously with the performance of the services by which they are to be measured and as *'accrued'* when those services have already been performed. Such accrual refers to the company's proposed undertaking to pay pensions in contemplation of the design of the plan and on the assumption that the plan will be continued and the employee will continue in the company's service until his rights vest."

 \* \* \* \* \*

" *'Past-service pensions'* is a term which has been arbitrarily assigned to mean that portion of the pension benefits which is measured by the length of time the employee was in the company's service prior to the date of the adoption of the pension plan." Dean, Accounting for the Cost of Pensions—A Lien on Production, 28 Harv.Bus.Rev., July 1950, pp. 25, 28.

 We use the term "past service" pensions or liability to refer to the benefits measured by the service of active employees i. e., active from 1942 to 1945, prior to the adoption of the 1942 Pension Plan.

5. The Part IV pension costs relate solely to the contributory portion of plaintiff's pension plan, with participation being optional with the employee. Part IV

tracted this sum from the allowable 4½% of total payroll, and paid the difference to the pension trustee, under Part III, to be used (except for a small sum) for funding the past service liability and for paying interest on that liability. Plaintiff allocated Part III costs of $644,301.90 to its contract. The total plaintiff claims for Contract NObs–458, with respect to Parts I, II, III, and IV, is $996,781.10.

The eligibility standards and the formula for computing old-age pensions (the major disputed category) were practically identical for each of the three Parts now in controversy. To qualify, employees needed 25 years continuous service with United States Steel or its subsidiaries. Post-1939 employment could be used in meeting this norm (except, of course, for those covered by Part I, all of whom retired before 1940). Employees' pensions were computed by averaging the earnings of the highest ten years of service up to January 1, 1945 or retirement, whichever occurred first, and by multiplying that average by a factor of 1% for each year of pre-1940 service. Thus, for workers who joined United States Steel before 1940, employment during the Navy contract period could be used for finally qualifying and also for increasing, somewhat, the amount of the pension (by enlarging the average of the highest ten years of earnings). The rather small fraction of plaintiff's pension obligations attributable to this 1942–1945 service was funded by the Part III contributions. The rest of the Part III payments went to the pre-1942 past-service liability. On the other hand, employees hired for the first time after 1940 were, in effect, excluded from eligibility by the pension formula, because their percentage multiplier would necessarily be zero—as would their resulting pension figure.

In August 1945, representatives of the Cost Inspection Service of the Navy Bureau of Supplies and Accounts disallowed the Part I, II, and III costs claimed by plaintiff. The Part IV costs were allowed. An appeal was taken to the Bureau of Supplies and Accounts (Cost Inspection Service), which affirmed the decision of the Navy Cost Inspector.[6] In substance, the disallowance was grounded on the view that these pension costs did not relate to employment during the contract period.

Plaintiff appealed under the Disputes Clause. It maintained that the disallowed contributions were "incident to and necessary for the performance of the contract", and thus reimbursable under the Green Book. The Government countered by arguing that plaintiff's obligations pertained primarily to pension credits earned by pre-1940 service, and that these were improper Green Book charges. It also contended that American Bridge's method of computing its Part III costs—on the basis of 4½% of total payroll—was erroneous and resulted in an excessive pension-fund contribution.

In October 1958, the Armed Services Board of Contract Appeals held that " 'past service' pension costs, as apparent from the very terminology, do not relate to the performance of work under the subject contract and therefore are not 'incident' to the contract", and not reimbursable. Primarily for this reason, the Board denied the claim "to the extent that Appellant [plaintiff] claims 'past service' costs". The claim was sanctioned, however, "to the extent that 'current service' costs are included in the Part II and III pension payments (i. e.,

costs of $33,134.55 were apportioned to the contract. These were allowed in full by the Navy and are not in dispute here.

6. There were some earlier determinations, during the course of performance, more favorable to plaintiff, on which it now relies as showing the minimal proper construction of the contract. We do not regard these preliminary actions as attaining the status of a definitive interpretation of the Green Book. They were, rather, tentative positions taken tentatively before the matter was fully considered. Cf. Deloro Smelting & Refining Co. v. United States, 317 F.2d 382, 385–386, 161 Ct.Cl. 489, 494–95 (1963).

that portion which 'accrued' for services rendered during the contract period'". The Part I cash disbursement costs were entirely excluded, since they were limited to pre-1940 service. The Board stressed that the recovery should include, in principle, the disability pension costs contained in Parts II and III as well as that portion of the Part II and III contributions properly allocable to plaintiff's contract on the basis that service during the contract period would increase the size of pension payments to eligible retirees. The dispute was remanded to the contracting officer for determination of these "current service" costs chargeable to the Navy.

Without proceeding on the remand, the contractor filed suit here on March 19, 1962. On the merits, its contentions are essentially the same as those advanced before the ASBCA. Plaintiff now emphasizes that its charging of past service pension costs as a current expense is both an ordinary industrial practice and an actuarially sound approach approved by good accounting theory—on the premise that past service pension costs are incurred in contemplation of a beneficial effect on the quality of an organization's present and future services. The company also alleges that the Government was well aware of its Part I and II costs at the time of the contract's negotiation and execution; that defendant knew of the Part III costs during negotiation and performance; and that the Navy realized that these expenses were a necessary business cost allocable to the contract. Initially, the Government maintains that plaintiff's claim is barred because (i) it failed to exhaust its administrative remedies, and (ii) in any event, it filed suit beyond the statutory limitations period (28 U.S.C. § 2501). On the merits, the Government seeks affirmance of the ASBCA decision, asserting that sound accounting practice supports that conclusion. We pass, first, upon the defense that the suit was not properly and timely filed in this court. We then treat the substantive aspects of the controversy.

**I**

In its briefs the defendant did not assert that this action was time-barred if the appeal to the ASBCA was mandatory. Its position was that the contractor had failed to exhaust its administrative remedy and could not yet bring suit because it had not proceeded with the remand, ordered by the Board, to determine the "current service" charges. Only if the administrative process was held to be nonmandatory did the defendant claim that the suit was barred by limitations. At the oral argument, however, the Government, having crystallized its position in Nager Elec. Co. v. United States, Ct.Cl., 368 F.2d 847 decided today, changed its defense to say that the entire action was untimely even though the administrative procedure was obligatory, because the petition had not been filed within six years of the completion of the Navy contracts in 1944 or 1945.

For the reasons given in Nager Elec., supra, we reject this new limitations defense. The present claim is one "under the contract" which had to proceed through the contracting officer and the Board of Contract Appeals; full relief could be granted by the Board under the contract and the plaintiff could not properly bring suit until the Board's determination. There was an inordinately long time between the contractor's appeal, in March 1946, under the Disputes Clause, and the Board's decision on October 30, 1958; the record does not show the reasons for this delay or who was at fault. The parties attempt to cast the blame on each other but we cannot tell which side is right. We feel, in any event, that the Government is in no position to complain of the delay since it allowed the proceeding to remain dormant before the Board of Contract Appeals for over 10 years.[7] Perhaps it

---

7. After a decade had elapsed, the Government moved to dismiss the appeal on the ground that the claim was barred from Board consideration by the 10-year stat-

was not the Government's legal obligation to revive the case, but it should not weep over the long lag since we assume that it could easily, during those ten years, have moved for a prompt hearing or to dismiss for lack of prosecution. There does not appear, moreover, to be any true detriment to the defendant from the delay. Interest is not allowable on any recovery, and there is no claim or reason to believe that Government evidence or records (which would have been introduced before the Board) were lost, destroyed, unavailable, or grew stale. Under United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), and United States v. Anthony Grace & Sons, 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966), the court will not take any new evidence but will determine the case on the administrative record. That record was fixed by 1958.[8]

■■■ As for the alternative defense that the suit is premature for failure to exhaust contract remedies, we hold that the plaintiff (1) sufficiently pursued its administrative remedy in obtaining the final Board determination that "past service" charges could not be reimbursed, but (2) cannot bring a new suit to review any administrative determination hereafter made on the "current service" question remanded by the Board (if plaintiff should choose to pursue that basis for relief). Once the ASBCA had rejected the demand for all "past service" pension costs—leaving only the minor amount available for "current service" charges to be computed—American Bridge could elect, as it did, to test its major claim in this court. The con-

siderable difficulties of isolating and calculating the "current service" factor, on remand from the Board, would be obviated or lessened if the court were to hold "past service" charges reimbursable in whole or in part. We see no reason why plaintiff should be forced, before coming here on the main aspect of the case which has finally been decided adversely to it, to go through the apparently arduous process of proving its entitlement to the minor recovery coming to it under the theory of the Board's decision which plaintiff rejects as wholly inadequate. The primary reasons for exhaustion are inapplicable to this situation; any possible administrative relief under the remand will obviously be unsatisfactory and there will be no facts found which bear on the issues before us. At the same time plaintiff cannot split its indivisible claim under the Navy contracts. See Nager Elec. Co. v. United States, Ct.Cl., 368 F.2d 847 decided today. This suit having been brought, no subsequent suit on the same contract would normally be allowable. Plaintiff bears that risk.[9]

II

In assessing plaintiff's contractual right to reimbursement of pension costs, we single out at the beginning five significant factors—all of them growing out of the facts we must accept as true—which necessarily condition our conclusion. The first is the particular time-point of the controversy in the history of American Bridge's pension system. For many years, the company satisfied its pension changes on the pay-as-you-go basis—expending and charging in each

ute of limitations applicable to the General Accounting Office (31 U.S.C. § 71a). The Board denied this motion in 1957, 57–1 BCA ¶1285. The matter then came on for an evidentiary hearing and for decision on the merits.

8. If, contrary to our view, the correct limitations rule is that the claim accrued on completion of Contract NObs–458 in February 1944, but that limitations was tolled during administrative consideration, this suit was still timely when

filed on March 19, 1962 (as defendant conceded at the oral argument). Less than six years of the elapsed time lay outside of the period of administrative consideration.

9. If plaintiff does proceed further with the question remanded by the Board, any dissatisfaction with the administrative resolution of that issue can probably be brought here by further amendment of the present petition.

year only the actual amounts of the pensions paid during that period to retired employees. In 1940 it was decided to fund the pensions of employees retiring after December 31, 1939 (Part II of the 1942 Pension Plan),[10] and late in December 1942 the plaintiff decided to take advantage of the liberal funding provisions of the Revenue Act of 1942 (Part III). The Navy work began under a letter of intent issued in February 1942, and continued into 1944 and 1945. Thus, at the outset of this war program, only the pay-as-you-go system (Part I) had been consistently in operation for a considerable period of time; Part II, with its funding provisions, was less than two years old; and Part III was not yet born.[11] It is also of some significance that these changes occurred in the early 1940's.[12]

A second important element is the nature of the pension costs incurred under Parts II and III. The bulk of these charges related to "past service" liability—pension costs attributable to periods prior to the adoption of those parts of the over-all pension scheme and prior to the performance of the Navy contracts.

■■ The third factor involves the eligibility for pensions of the employees who worked on the Navy project. Because of the requirements of plaintiff's pension system, heavily weighted toward pre-1940 employment, workers hired after 1940 would not receive company pensions. Moreover, service during 1942–1945 would not add much to the amount of the annual pensions ultimately received by those employees who had come to work before 1940. These facts are important because it appears that a large proportion of American Bridge's employees on the Navy work were newly hired for those contracts and did not come from the pool of pre-1940 workmen; in addition, many of them were temporary for the war period. This was particularly true of the shipyard employees. The ASBCA found "that few of the shipyard employees were or would be eligible for such pensions, with respect to both superannuation and disability. [Plaintiff] concedes that not more than 10 per cent of the shipyard personnel would qualify for superannuation pensions."[13] The company attacks these and the related findings, but it is clear that they are supported by substantial evidence in the record as a whole and must be accepted here.[14]

Fourth, the pertinent terms of the Green Book bearing on the reimburs-

10. Continuing pay-as-you-go for those previously pensioned (Part I).

11. It is appropriate to take February 1942, the time of the letter of intent, as the commencement of the Navy work. The formal contract, executed early in 1943, was the anticipated outgrowth and continuation of this letter of intent. The other three contracts followed close upon the first one, and for present purposes it is right to treat all four agreements as part of one continuing project starting in February 1942.

12. Although the 1942 amendment to the Internal Revenue Code liberalized the deduction for pension expenditures, since 1928 the tax law had permitted a deduction for contributions to funded plans. U.S. Steel had considered funding as early as 1931, but did not take any steps in that direction until the 1940 modification.

13. The Board continued: "With respect to the disability pension costs included in the Part II pension payments, the Board finds that the 90 per cent eligibility factor used by [plaintiff] does not give proper weight to [plaintiff's] temporary employees, particularly those in the shipyard."

14. The pension eligibility rules and the standards for employment tell much of the story. The Board's figures as to the rise and fall of employment in the shipyard were taken from an affidavit by an employee of plaintiff, and the figures as to overall American Bridge employment are also adequate. The characterization of the major part of these employees as temporary was likewise supported by eyewitness testimony. We think that the Board drew the correct inferences from the record, or at least permissible inferences, especially since the burden of proof was and is on the plaintiff.

ability of pension costs are not precise or definite but uncertain and unclear. The Book defines "allowable expenses" as including: (i) "Pensions and retirement payments to factory employees" (¶ 29(f)); and (ii) "the cost of pension and retirement provisions for administrative and office employees" (¶ 40(c)). Both of these categories are classified as indirect business expenses. The main difficulty is that these phrases do not in themselves indicate, one way or the other, whether reimbursement of pension costs relating to past, as well as present, service is sanctioned. Also, the general criteria governing cost-determination can be variously interpreted and applied. Paragraph 4 declares that reimbursable costs are those "incident to and necessary for the performance of the contract and properly chargeable thereto." Other paragraphs call for "interpretation and decision according to the nature of the item" sought (¶ 6), for consideration of "all the pertinent facts and circumstances" (¶ 39), and for some deference to "generally accepted and sound accounting practices" (¶¶ 5, 70). All these offer some guidance but none is an exact directive. We shall have to look beyond the phrases in the Green Book for our answers.

■■ The last conditioning factor we emphasize is the general principle that Government CPFF contracts pay the contractor only for the costs of his Government work. Generally, these agreements are designed to give businessmen the expenses of operating that portion of their enterprise dedicated during the contract period to Government work together with a reasonable profit (see 21 Comp.Gen. 149, 151 (1941); 21 Comp.Gen. 462 (1941)), not to pay the costs of their past operations. A main purpose is to insulate contractors against risks they could not be expected to bear without setting up extraordinary reserves for contingencies. Conversely, key drawbacks, from the Government's standpoint, are that the "risk of variations in allowable costs is borne entirely by" it, and that the contractor ordinarily

has little or no financial inducement to economy and efficiency. See Braucher & Hardee, Cost-Reimbursement Contracts With the United States, 5 Stan.L. Rev. 4, 9 (1952); United States v. Bethlehem Steel Corp., 315 U.S. 289, 292–293 & n. 2, 62 S.Ct. 581, 86 L.Ed. 855 (1942). For these reasons (and others), pressures—both within the contracting departments and to some extent from the Congress (see Braucher, Fixed Prices and Price Redetermination in Defense Contracts, 53 Colum.L.Rev. 936, 937–38 (1953); Fain & Watt, War Procurement—A New Pattern in Contracts, 44 Colum.L.Rev. 127, 143 (1944); cf. Muschany v. United States, 324 U.S. 49, 59–63 & n. 12, 65 S.Ct. 442, 89 L.Ed. 744 (1945)—have tended to limit the authorization for use of CPFF contracts and to shave the categories of allowable costs. See generally Reck, Historically Difficult Cost Areas, 18 Fed.B.J. 235 (1958); Cork, Cost Problems, 18 Fed. B.J. 253 (1958); Reed, Industry Accounting Systems, and the Role of the Government Auditor, 18 Fed.B.J. 277 (1958). In many areas, a heavy overlay of "governmentally-blessed tests of 'legitimacy', 'reasonableness' and 'allocation'" has grown up by statute, administrative action, and judicial decision. Lazure, Historically Difficult Cost Problems in Contract Administration, 18 Fed. B.J. 211, 215 (1958).

■ The motivation for many of these rules is a desire to facilitate the Government's use—mainly during crises —of CPFF contracts, without its bearing near-prohibitive expenses; the rules aim at serving the end for which such contracts were authorized and at minimizing their inadequacies. Although every request for reimbursement must independently be tested by this purpose and by the particular standards in the claimant's contract, the request should ordinarily be denied when "the United States * * * receive[s] no tangible benefit from * * * expenditure[s] which [add] * * * nothing to the actual performance of the work." 22

Comp.Gen. 349, 357 (1942).[15] This rationale protects the national treasury, fairly and reasonably, against excessive and improvident demands.

### III

In the light of these factors, we are unwilling to read the general references to pension costs in the Green Book as covering this plaintiff's funding of its "past service" liability (as incorporated in Parts II and III of the 1942 Pension Plan).[16] The heart of our disagreement is that the attribution of funded "past service" liability to current work was not so established or fixed a practice in 1942 that the Government should be expected to pay large sums assignable, not to the current work of post-1940 employees engaged on the Navy contracts, but to the pre-1940 employment of others of U. S. Steel's workmen. In that period of pension and cost-plus history, reimbursement of "past-service" costs newly incurred under a funding amendment to an existing pension plan was most doubtful, at the very best. Even if allowed, such costs would have to be on a fair and equitable basis, freeing the Government of an undue share of the pre-contract liability; but, in our view, when plaintiff adjusted its

Parts II and III in 1940 and 1942, it necessarily loaded the work performed during the first half of the 1940's, especially this Navy work, with far too high a portion of the pre-1940 and pre-1942 liability.[17]

*A.* It is very doubtful that, as of the start of the Navy work in 1942 (or during the time of performance), *any* "past service" liability, especially if first incurred by a 1940 or 1942 change in a company's existing pension system, would be considered properly reimbursable under a cost-plus contract (with the general terminology of the Green Book) covering the immediately ensuing period. Such a new funding scheme would not, of course, have the special warrant of long-continued company practice. Nor was there, in 1942–1945, a consensus that the "past service" component of a newly-instituted funding system was properly chargeable to current and future work.[18] Plaintiff relies on Accounting Research Bulletin No. 36 (Nov. 1948) of the American Institute of Accountants (Committee on Accounting Procedure) ("Pension Plans—Annuity Costs Based on Past Service") which states "that, even though the calculation [of pension benefits] is based on past service, costs

15. See Note, Determination of Cost in Military Procurement Cost-Plus-A-Fixed-Fee Contracts, 65 Harv.L.Rev. 1035, 1040–41 (1952), where numerous contract appeal board and court decisions are analyzed and the test of allowability is defined as follows: "Cost must have a proximate relation to the proper performance of the CPFF contract to be reimbursable. * * * But to be allowed, a cost must be attributable primarily to the work performed on the CPFF contract."

16. That this is an issue of law for independent determination by the court under the Wunderlich Act hardly requires citation. See River Constr. Corp. v. United States, 159 Ct.Cl. 254, 262 (1962); Thompson Ramo Wooldridge Inc. v. United States, 361 F.2d 222, 235, 175 Ct.Cl. ——, —— (1966).

17. We are not referring primarily to the allocation between Government work and non-Government work during the period

1942–1945, but to the allocation between all of plaintiff's work during that period and its work during the subsequent and prior periods.

18. We note that one must look with some care and caution to "generally accepted accounting principles" for aid in determining the allocability of costs to CPFF contracts. Such principles "have evolved primarily out of the need for principles of asset valuation and periodic income measurement" (Wright, The Theory of Cost Principles, 18 Fed.B.J. 165, 169 (1958)), and are "not cost accounting principles," but "cost accounting concepts * * * [may] evolve out of" them. Wright, Accounting for Defense Contracts 29 (1962). The standard should not be automatically accepted for use in the present context, come-what-may. Moreover, in many instances, there may be little professional agreement as to what alternatives are the most reliable or desirable. Wright, supra, 18 Fed.B.J. at 165.

of annuities based on such service are incurred in contemplation of present and future services, not necessarily of the individual affected but of the organization as a whole, and therefore should be charged to the present and future periods benefited" (para. 3). There is no showing, in the first place, that this position (announced in 1948) was, as contemplated by the Green Book, "generally accepted" during the period of the Navy contracts—and that is, of course, the time at which we must judge the validity of plaintiff's argument. The contrary seems to have been true. In 1952, the primary conclusion drawn from a study (of over 200 plans) of the methods used both to finance pensions and to determine costs was that "the most conspicuous thing about accounting for pension plans today is * * * that there is no uniformity of * * * determining the amount to be charged to the year * * *." Ogden, Survey of 260 Pension Plans, 93 J. of Accountancy 44 (1952). The author pressed for adoption of the principle that "the total estimated cost of providing an employee's pension should be accrued rateably over his period of active service", suggesting that that principle "should be generally acceptable." Id. at 47. Moreover, as late as 1956, the Committee on Accounting Procedure of the AIA noted that "variations in the provisions of pensions plans * * *, in their financial arrangements, and in the circumstances attendant upon their adoption, have resulted in substantial differences in accounting for pension costs", and that it believed "that opinion as to the accounting for pension costs has not yet crystallized sufficiently to make it possible at this time to assure agreement on any one method, and that differences in accounting for pension costs are likely to continue for a time" (Accounting Research Bull. No. 47, paras. 1 & 7 (Sept. 1956)).

If anything, the accounting consensus can be said to be that, in a case like plaintiff's, "past service" liability should *not* be charged to current and future work. The 1940 and 1942 changes in the American Bridge (and the United States Steel) pension system created for the first time funding provisions in an existing pension plan which went back for some two decades. Accounting Research Bulletin No. 47 (Sept.1956) of the AIA ("Accounting for Costs of Pension Plans"), supra, reaffirmed Bulletin No. 36, supra, but added that the committee was of the opinion that "past service benefit costs should be charged to operations during the current and future periods benefited, and should not be charged to earned surplus *at the inception of the plan*. The committee believes that, in the case of an *existing plan* under which inadequate charges or no charges for past services have been made thus far and the company has decided to conform its accounting to the preferred procedure expressed in this bulletin, it may be appropriate to charge to earned surplus the amount that should have been accumulated by charges to income since the inception of the plan" [emphasis in original].[19] (Accounting Research Bull. No. 47, supra, para. 3.) The second sentence fits plaintiff's case precisely. The 1940 and 1942 amendments were modifications in an existing retirement plan, not the inception of a new plan.

*B.* Aside from the views of the accounting profession and the pension practices of American firms, there is another useful aid in judging the compass in 1942 of the cryptic command that reimbursable "pension and retirement" charges are those "necessary" and "in-

19. Apparently the thinking behind Bulletin No. 47 was that, although past service benefts are properly chargeable as ongoing costs of doing business to current and future work if the whole pension scheme is new and the company's present or future business must therefore bear the cost of the new plan, such past service liability need not be saddled on current and future work where there is an existing pension plan under which expenses attributable to the plan have been regularly charged in inadequate amounts to past work.

cident" to performance—the regulation from which the rule evolved. The Green Book was based largely on Treasury Decision 5000 (1940–2 Cum.Bull. 397), the last of a series of Treasury rulings— issued under the Vinson-Trammell Excess Profits Act—defining allowable costs and the permissible percentage of profit for certain Government contracts.[20] Both documents required that costs be "incident to and necessary for the performance of the contract"; permitted recoupment of direct as well as indirect expenses; distinguished between factory or shop charges and those of administration; and provided for reimbursement of welfare, pension, and retirement expenses. The controlling general philosophy as well as the specific directions of the two sets of principles— Green Book and TD 5000—are congruent as to almost all their common problems.

 The consistent premise underlying TD 5000 seems to have been that it covered, generally, only costs connected with materials being used and services being rendered during the contract period. One indication of this is the section dealing with "allocation of indirect costs" (§ 26.9 (j)), including pension expenses of both factory and administrative employees. It stated, initially, "that all items which have no relation to the performance of the contract * * * shall be eliminated from the amount to be allocated * * *." It then provided (subsec. 1) that "allowable indirect factory expenses" should "ordinarily" be " 'distributed' to the cost of the contract * * * on the basis of the proportion which the direct productive labor * * * attributable to the contract * * * bears to the total direct productive labor of the production depart-

ment * * * *during the period within which the contract * * * is performed* * * *"* (emphasis added).[21] This formula would seem to apply most fairly and equitably—the same subsection makes it plain that fairness and reasonableness are prime considerations in implementing the provision—if the "allowable indirect factory expenses" themselves are also limited to costs of the contract period. The blanket inclusion of indirect, pre-contract charges could thus be said to be at odds with the directive excluding items having "no relation" to performance.

While the Green Book does not, in terms, spell out a preference for contemporaneity, it does demand the fair and equitable allocation and apportionment of costs.[22] The more-specific content of TD 5000 can appropriately be used for infusing the Green Book's general terms with sharper meaning since the two documents are so clearly and integrally related.

It is also significant that when the intention to allow reimbursement of past expenses has concededly existed, it has been explicitly manifested—both in TD 5000 and in the Green Book. For example, the former provided that when "experimental and development costs have been properly deferred or capitalized and are amortized *in accordance with a reasonably consistent plan,* a proper portion of the current charge * * * may be treated as a cost of performing the contract * * *" (§ 26.9(d)) (emphasis added). This section was the basis for our allowance of certain deferred experimental and development charges "incurred several years prior to the entry into the CPFF contracts * * *" in Bell Aircraft Corp. v. Unit-

---

**20.** 48 Stat. 505 (1934), as amended, 10 U.S.C. § 7300 (1964). The original act limited the profits allowable under certain defense contracts for Navy vessels and Army and Navy aircraft. See Braucher & Hardee, supra, 5 Stan.L.Rev. at 15–17.

**21.** Subsection (j) (3) provided similarly with respect to "administrative expenses".

**22.** The Green Book section which approximates, and produces the same result, as TD 5000's section 26.9(j) (1) is paragraph 67: "This basis [of apportionment] frequently is to charge to Government business a proportion of the total expenses equal to the ratio between manufacturing costs plus other contract performance costs and the total of such costs for the business as a whole."

ed States, 100 F.Supp. 661, 700–701, 704, 120 Ct.Cl. 398, 469–472, 477–478 (1951), aff'd by an equally divided court, 344 U.S. 860, 73 S.Ct. 102, 97 L.Ed. 668 (1952). See also Merrill-Stevens Dry Dock & Repair Co. v. United States, 96 F.Supp. 464, 467, 119 Ct.Cl. 310, 324 (1951). In similar fashion, a specific Green Book provision treats the allowability of developmental costs "not related to current manufacture."[23] In still other contracts, the allocability of questionable costs is subject to a requirement of advance understanding with the contracting officer. See, e. g., Fred T. Ley & Co. v. United States, 273 U.S. 386, 47 S.Ct. 388, 71 L.Ed. 698 (1927); Pan American Airways, Inc. v. United States, 81 F.Supp. 231–233, 112 Ct.Cl. 333, 386–390 (1948). These are indications that, in CPFF contracts, costs attributable to the past, or possibly unrelated to the Government work, are treated specially, not routinely or as governed by general phrases.

American Bridge stresses that it is entitled to *"indirect* shop costs", which "include miscellaneous factory expenses *not* directly attributable to ˙the contract * * *." (Green Book, ¶ 29, emphasis added). This is so. But the same paragraph expressly stipulates that these expenses must be "necessary and incidental to services [and] operations * * * *involved in the performance* of the contract * * *." [Emphasis added.] TD 5000 also allowed such indirect factory expenses, "but not including any amounts which are not incident to services [and] operations * * * involved in the performance of the contract * * *." (§ 26.9(c) (5) (E)). An earlier Treasury decision defined the "cost of performing" as including a "reasonable proportion of any indirect costs * * * appertaining to the contract which are not usually directly allocated to the cost of performing the contract." (TD 4434, XIII–1 Cum. Bull. 540, 542 (1934)). The distinction is that between direct costs (such as materials, parts, and "direct labor") and indirect costs—not between current and past expenses. The language plaintiff emphasizes falls short of providing a footing for reimbursement of all its "past service" pension costs. Indeed, it may well be that the phrase "not directly attributable to the contract" was inserted, in part, for the purpose of ensuring reimbursement of *"current-*service" pension expenses.[24]

23. Paragraph 32 of the Green Book provided that "research, experimental and development costs *not related to current manufacture* but devoted to future improvement in and application of products" "may be absorbed in manufacturing cost on a regular basis by means of absorption rates, on the principle that these activities are usually maintained under a *consistent program* independently and apart from current manufacturing operations, and that their benefit relates to products on a uniform scale over a period of years more properly than according to actual expenditures in any given year. When these costs are deferred or capitalized *in conformity with a consistent plan,* reasonable allocation may be treated as a cost of performing a contract." [Emphasis added.]

24. Cf. a letter from the Comptroller General to the Chairman of the Senate Military Affairs Committee (which held hearings on "A joint resolution to prohibit the use of cost plus a fixed fee system of contracting in war contracts" in March 1944) objecting to the use of TD 5000 in cost contracts: "The generously inclusive formula therein [in TD 5000] set forth for determining costs—including such items as repair and depreciation of office equipment, contributions to local charities or community chests, fees and dues for memberships in trade associations, etc., [also allowed by Green Book ¶ 40(b) (f) (g)] expenditures in connection with *employees welfare activities,* and *other expenditures connected only indirectly with the actual work* under the contract—may be entirely proper in the determination of excess profits, but when such regulations are adopted as a yardstick for use by the contracting officer in determining what items are to be reimbursed as costs under the cost-plus-a-fixed-fee contract the improvidence of such a system of contracting would seem to be apparent. I have no doubt that many expenditures are made by some cost-plus contractors which could have been avoided without detriment to the contract performance and which would

*C.* Still another consideration buttresses the position that in 1942–1945 funded "past service" liabilities were probably not considered reimbursible under the Green Book. After World War II, the services jointly developed a statement of cost principles to replace the Green Book. Following several preliminary revisions, the first version of section XV of the Armed Services Procurement Regulations (ASPR) ("Contract Cost Principles", 32 C.F.R. § 414.000–.502 (1951)) was issued to be effective as of March 1, 1949. In many significant respects, these ASPR resembled the Green Book; there is little evidence of any general intention to liberalize the classes of compensable expenses. See Bellows, Cost Principles in Industry, 18 Fed.B.J. 175, 176 (1958); cf. Braucher, 53 Colum.L.Rev., supra, at 939–42. They applied to most cost-reimbursement type contracts, providing for payment of "direct costs incident" to performance and a "properly allocable portion" of indirect costs. Allowable costs included "pension" and "retirement" benefits (§ 414.204(c) (p)). Like the Green Book and TD 5000, they did not distinguish between present and past service pensions, but the assumption seems to have been that these costs were allowable "only if related to the period of performance." Note, 65 Harv.L.Rev., supra, at 1041–42.

Some years after its promulgation, section XV was amended to provide specifically, for the first time, for reimbursement of the "cost[s] of pension and retirement plans * * * which are deductible from taxable income" under the Internal Revenue Code and regulations, with certain limitations. (32 C.F.R. § 414.601–2 (1954 Supp.)) [25] This meant that payments made to fund past credits of employees—such as plaintiff's tax-sanctioned Part III contributions—were then allowable. While, on its face, this "interpretation" might be read as a mere

exposition and clarification of what the services considered to be the existing rule, it also can be seen as a liberalization and reversal of the earlier standard, thought by the services to have probably excluded past service costs. A central factor is that the interpretation was prospective only, applying to contracts (which provided for reimbursement of "pensions") executed on or after January 1, 1952 (§ 414.601–1). If it was simply expositive, rather than a substantive change, strong pressures—such as the administrative need for a uniform, readily applied, definite standard—would probably have called for its application to outstanding contracts. This was, for example, the course chosen in 1945 when the Navy's Supervisory Cost Inspector issued the interpretation (Technical Memo #68) of the Green Book excluding plaintiff's past service pension costs. Moreover, since the interpretation was from a financial viewpoint favorable to contractors, retroactive application would not have produced industry pleas of "inequity" or "unreasonableness". Prospective application was chosen, it seems likely, because it was thought that the amendment probably defined a new class of reimbursable costs. In any event, the new norm of allowability (deductibility under the tax laws) was plainly much more than an interpretation of the rule as it had been during plaintiff's contract, for the Green Book expressly stated that the "status" of items of cost as tax deductions was "not the criterion" for reimbursement (¶ 3).

It is also worth noting that the 1952 amendment provided that past service expenses—such as the "costs of lump sum purchases of annuities or of periodic cash payments * * * [to] retiring or retired employees"—not incurred under IRS-approved plans would be reviewed "on an individual case basis" (§ 414.601–2(g)). This provision is consistent with

have been avoided but for the fact that the contractor knew they were reimbursable under the contract." Quoted in Lazure, supra, at 218, n. 17 (emphasis added).

25. This 1952 amendment set "forth interpretations of certain cost principles contained" in other provisions of ASPR, i. e., the provisions allowing reimbursement of "pensions" etc.

the amendment's generous purpose on the assumption that, prior to 1952, past service expenses were excluded while costs of approved plans would now be *prima facie* allowable, and reimbursement would be considered even for costs of non-approved plans. Before 1952, as we have noted, there was no contractual basis for distiguishing between qualified and non-qualified plans. If past service costs had always been reimburseable, as plaintiff contends, subsection (g) would amount to a new limitation or obstacle to recovery. In the context, this seems most doubtful. In sum, we are impelled to read the post-World War II regulations on past service pension costs as recognizing that a change was being made.

*D.* From this survey of accounting views and company practices as of 1942–1945; of TD 5000; and of the subsequent development of pension-cost reimbursement—together with the general principle against a loose reading of CPFF reimbursement provisions—we conclude that it is unlikely (i. e. that plaintiff has not shown) that funded "past service" pension costs were allowable at all under the Green Book in 1942–1945. But even if the general phrases of the Green Book did sanction some assignment of "past service" benefits to current and future work, we feel certain that any such allocation would have to be more equitable than that made by this plaintiff.

 One fair system would require the pre-1940 and pre-Navy contract service costs to be apportioned over the remaining active working life of all those employees who would ultimately receive pensions. See Ogden, Survey of 260 Pension Plans, 93 J. Accounting 44, 47 (1952), quoted supra. Another might call for a charge-off over a lengthy reasonable period less than these employees' full productive life. See Accounting Research Bull. No. 47, supra, para. 5.

Whatever the plan, it should not compress too much of the past costs into the war years or allocate pension expenses to workmen who would never receive pensions. American Bridge's scheme seems to have incorporated both of those defects. Because of the company's special pre-1940 requirement for pension eligibility, and because of the post-1940 or temporary employment of most of the shipyard employees, Parts II and III of the Pension Plan loaded far too much of the plaintiff's pension liability onto the years from 1942 to 1945, and into the Navy work. A good portion of the past-service costs of Part II and Part III payments (and some of the current service costs) represent very substantial pension liabilities assignable to men who never worked on the Government project, or who worked but little of their productive life on those contracts, or who would never obtain any pension at all from American Bridge (or United States Steel). For this reason, we cannot escape thinking that to allow reimbursement of Part II and Part III expenses, as they stand, would discriminate against the Government by imposing on it large expenses not fairly attributable, in any sense, to the Navy program. Plaintiff has presented *no alternative suggestion, shaving down or reallocating those expenses on a fairer basis*, and we therefore must reject *in toto* the proposal for reimbursement of these payments.[26]

IV

In subsection III of this opinion, supra, we have decided that plaintiff cannot avail itself, for reimbursement of "past service" pension costs, of the new changes made by Parts II and III of its general pension plan. If the plaintiff wishes to salvage as much as it can from those newly adopted modifications, it can pursue the relief given it by the Armed Services Board of Contract Appeals to obtain reimbursement of Part II and Part III

---

26. Since plaintiff voluntarily chose to fund its pension plan only in 1940 and 1942, although it could have done so much earlier (see footnote 12, supra), it is just to put on it the burden of showing that the Government has not been treated unfairly as a result of the then-recent funding. Cf. Note, Unfunded Actuarial Liability: The A.T. & T. Pension Plan, 64 Harv.L.Rev. 633, 640, 641–42 (1951).

pension costs to the extent that they include "current service" pension costs for employees likely to receive pensions.[27]

Can the company choose, instead, to continue for reimbursement purposes with its old pay-as-you-go system in effect from 1911 to 1940? We think so, and hold that the plaintiff can recover, at its election, either (a) the pension contributions awarded by the ASBCA or (b) the cost of the cash payments made during the contract to pre-1940 pensioners (Part I), plus the cost of the annual cash benefits which were paid during the contract period to post-1939 pensioners—but which were actually financed by the Part II terminal funding payments—up to the limits of the Part II and Part III expenditures.

In reaching this latter conclusion, we proceed against the backdrop of history, both general pension history and American Bridge's own pension development. For a good part of this century, cash disbursement financing was the recognized method widely used for pension plans. Industrial giants other than plaintiff resorted to it. See, e. g., New England Tel. & Tel. Co. v. United States, 53 F. Supp. 400, 401–402 (D.Mass.1943); Note, 64 Harv.L.Rev. 633 (1951). Pay-as-you-go was the simplest method, and, in an era when public concern with systems of social security and insurance was only beginning, it apparently was the common practice utilized by many businesses (perhaps a majority). Note, Legal Status of Private Industrial Pension Plans, 53 Harv.L.Rev. 1375, 1377 & n. 13 (1940). It was not until the late 1930's that it was widely acknowledged that the method was defective because it did not enable businesses to distribute their pension costs evenly over the period during which their plans would be in operation. See Note, 53 Harv.L.Rev., supra, at 1383; New England Tel. & Tel. Co. v. United States, 53 F.Supp. at 402.

Plaintiff charged off its pension costs on this basis from the beginning of the United States Steel pension plan in 1911 through 1940. Part I continued the same method for pre-1940 retirees.

These historical facts that cash disbursement financing was for decades widely recognized as acceptable and sound, and was adhered to for a long period by plaintiff, cannot be ignored. Especially is this so because the trend away from the formerly-used method was only in the process of maturing at the consummation of the Navy agreement in 1942. A consistent allocation of expenses under a reasonable plan is a proper basis for holding that the costs are "incident to and necessary for" performance.[28] It is not crucial that the plan may appear to contain certain flaws when tested by more enlightened methods. Cf. Electronics Corp. of America, 61–2 BCA ¶ 3134 at 16,272 (1961); Hackensack Water Co. v. United States, 352 F.2d 807, 809–810, 173 Ct.Cl. ——, —— (1965); The Bullard Co. v. United States, 364 F.2d 429, 176 Ct.Cl. ——. Such an approach would be unrealistic. The Green Book's categories are neither all-inclusive or exclusive; their meaning is subject to "interpretation * * * according to the nature of the item" claimed (¶ 6); and "all the pertinent facts and circumstances" must be considered (¶ 39). The Book recognizes implicitly both that accounting theories evolve and that, sometimes, it may be impractical or undesirable for businesses to conform with accounting optima.

---

27. We read the Board's remand as contemplating, also, reimbursement for so much of plaintiff's pension contributions in Parts II and III as were (i) properly attributable to American Bridge employees on military leave who were likely to receive company pensions ultimately, and (ii) allocable to the Navy work.

28. A similar rule for the apportionment of costs determined to be allocable to the contract was established by Green Book para. 69: "Where the nature of the business of the contractor has not changed basically by the shift to war production, the presumption is that *former methods, presumably tested by operation over a considerable period, are satisfactory*, although this is only a presumption and should be reexamined in the presence of war production." [Emphasis added.]

**416**

We are justified in relying on the fact that plaintiff used its pay-as-you-go method for some three decades prior to 1940. Cf. John Wanamaker Inc. v. United States, 359 F.2d 437, 441, 175 Ct.Cl. ——, —— (1966). The consistent use of one accounting method reduces the possibility of distortion of expense items. Cf. Commissioner of Internal Revenue v. O. Liquidating Corp., 292 F.2d 225, 230–231 (C.A.3, 1961), cert. denied, 368 U.S. 898, 82 S.Ct. 177, 7 L.Ed.2d 94. It assures against the unwarranted manipulation of alternatives. See Wright, Accounting for Defense Contracts, supra, at 32. The unbroken 30 year pattern, beginning with the plan's inception, indicates that the expenses were necessary incidents of American Bridge's business. Of course, the consistent pursuit of a plainly improper method of accounting is not enough to justify its use. But that is not the case here, for at the time American Bridge chose the method (and for most of the period during which it was used) it was an acceptable practice. Change did come, but by that time "changed circumstances so alter[ed] the original situation that the initially selected method * * * [was] no longer the best one", and change was desirable. Ibid.

That the cash disbursements method necessarily relates, in form, to past services is not a bar to recovery. This was simply the formula for determining, each year, the pension costs borne by the company in that period, and a much easier way than trying to decide the pure "current service" costs for the period. In effect these pay-as-you-go payments were taken as the rough measure of the "current service" costs of the year. Since the same system was used from the inception of the pension plan in 1911 there was little likelihood that any particular period would be saddled unduly with "past service" costs. And since it would have been to the plaintiff's economic advantage, over the years, to pass on its general costs in a reasonable way, without undue burden to any one purchaser, it is improbable that any customer (including the Government) would absorb an excessive part of the pension expenses. Such long-continued consistency can minimize defects which stand out when one isolates and fixes upon a particular period. We have little doubt that, if plaintiff had simply continued with the pay-as-you-go system through 1945 without adopting any funding modifications, the Navy would have paid those pension costs without demur. The long-continued practice would have been deemed enough of a sanction that the expenses fairly (though approximately) measured the current service pension costs attributable to the contract years.

Having held that plaintiff cannot utilize its new Part II and Part III modifications to obtain reimbursement (except insofar as the ASBCA allowed), we think, for the reasons just given, that it may choose, if it wishes, to act as if it had continued its old plan throughout the period of the Navy contracts without change. On that basis recovery would cover the Part I payments plus the other pension payments made to retirees in 1942–1945—properly prorated to the Navy contracts and limited by the total pension costs actually incurred in that period under Parts II and III. This election will prevent plaintiff's being affirmatively harmed by its good-faith adoption in 1940 and 1942 of pension systems which do not, in largest part, permit of reimbursement under the Green Book. The company will not gain from those recent modifications, but neither will it be hurt if it chooses not to be.

We hold therefore that plaintiff is entitled to recover to the extent indicated in this opinion, and to that extent judgment is entered for plaintiff, its motion for summary judgment is granted, and the defendant's is denied. With respect to the rest of the claim, the plaintiff's motion is denied, the defendant's is granted, and the petition is dismissed. Unless there is agreement as to the amount of recovery, the proceedings here will have to be suspended so that the parties can return to the Armed Services Board of

Contract Appeals for initial determination of the amount due under this opinion. United States v. Anthony Grace & Sons, 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966).