**FORD MOTOR COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 99–121C.

United States Court of Federal Claims.

April 1, 2003.

---

Charles J. Cooper, Washington, D.C., attorney of record for the plaintiff, Michael W. Kirk and Margaret A. Ryan, of counsel, Washington, D.C.

Lawrence N. Minch, Department of Justice, Washington, D.C., with whom was Assistant Attorney General Robert D. McCallum, Jr., David M. Cohen, Director, for the defendant.

### OPINION

MEROW, Senior Judge.

Ford Motor Company has commenced this suit against the United States, based on a World War II contract, to obtain a judgment for the over $7,000,000.00 it has paid as its share of the environmental clean-up costs for the Willow Run, Michigan factory site where it built B–24 bombers from 1942—1944. The parties have filed dispositive motions.

### FACTS

On September 26, 1941, a cost-plus-fixed-fee supply contract (No. W535–ac–21216) ("Contract No. 21216") to manufacture and deliver 795 B–24E airplanes with spare parts at a total estimated cost of $218,625,000.00 was entered into between the Army Air Force and Ford Motor Company. By supplemental agreement the number of airplanes was increased to 1,495 and the total estimated cost increased to $429,812,500.00. The contract was to be performed at the Willow Run Site where Ford commenced to build a manufacturing facility which it conveyed to the Government. The Government, in turn, leased the facility back to Ford for its completion and operation. At the site,

Ford also built a dual purpose waste water treatment plant to handle both industrial and sanitary wastes. In 1942, Ford built a sludge lagoon formed by constructing an earthen dam at the end of a natural ravine to accept sludge, from acid-cyanide plating, which was deposited from waste water treatment plant operations.

Article 3 "Consideration" of Contract No. 21216 provided for the payment of the costs incurred by Ford in performing the contract plus a fixed fee. Article 3(b) provided, "[f]or purposes of determining the amounts payable to Contractor under this contract, allowable items of cost will be determined by the Contracting Officer in accordance with regulations for the determination of the cost of performing a Government contract as promulgated by the Treasury Department in Section 26.9 of Chapter I of Title 26 of Code of Federal Regulations, as contained in T.D. 5000 and approved by the Secretary of War August 2nd, 1940, . . . ." [1]

Article 3(b), as amended by Supplemental Agreement No. 4, dated April 11, 1942, also listed some fourteen categories of costs which would be allowable, such as:

\* \* \*

(12) If upon the termination or completion of this contract, the Contractor shall be required to pay additional taxes or contributions pursuant to the Unemployment Compensation Act of the State of Michigan, by reason of the effect on the experience index of the Contractor, arising out of the discharge of persons on account of such termination or completion, then such additional taxes or contributions shall, to the extent that such allowance may be lawful, be allowable as an item of cost hereunder;

(13) Cost of such bonds and insurance as the Contracting Officer may approve or require and cost and expenses incurred in the defense and/or discharge of such claims of others on account of death or bodily injury of persons or loss or destruction of or damage to property as may arise out of or in connection with the performance of the work under this contract

shall be an allowable item of cost hereunder, provided that such reimbursement shall not include any amount for which the Contractor is indemnified or compensated by insurance or otherwise, or any amount for which it would have been so indemnified or compensated except for the failure of the Contractor to procure or maintain bonds or insurance in accordance with the requirements of the Contracting Officer. The foregoing shall not restrict the right of the Contractor to be reimbursed for the cost of insurance covering the Contractor's property or property for which the Contractor is responsible to someone other than the Government and which is used or to be used in the performance of this contract.

\* \* \*

Article 9 of Contract No. 21216, "Termination of Contract by Government" provided, upon termination action by the Government, for the payment of Ford's unreimbursed incurred costs, as determined in accordance with Article 3 of the contract, and a portion of the fixed fee to be determined on the basis of a ratio between incurred costs and estimated net costs to fully perform the contract. Upon a failure of the Contractor and the Contracting Officer to agree on the estimated net costs to perform the contract, Article 9 provided that, "said estimate shall be determined in the manner provided in this contract for the adjustment of claims and disputes." With respect to costs, Article 9(b)-(c) provided:

(b) Upon the termination of this contract as hereinbefore provided, full and complete settlement of all claims of the Contractor arising out of this contract shall be made as follows:

(1) The Government shall assume and become liable for all obligations, commitments and claims that the Contractor may have theretofore in good faith undertaken or incurred in connection with said work and in accordance with the provisions of this contract; and the Con-

---

1. *See United States Steel Corp. v. United States* 177 Ct.Cl. 26, 45, 367 F.2d 399, 411 (1966)

(application of T.D. 5000 in the resolution of a cost allowability issue).

tractor shall, as a condition to receiving the payments mentioned in this Article, execute and deliver all such papers and take all such steps as the Contracting Officer may require for the purpose of assuring to the Government, so far as possible, the rights and benefits of the Contractor under such obligations or commitments.

(2) The Government shall reimburse the Contractor for all costs incurred by the Contractor in the partial performance of this contract as determined in accordance with Article 3 and not previously reimbursed.

(3) The Government shall reimburse the Contractor for such further expenditures after the date of termination for the protection of Government property and for accounting services in connection with the settlement of this contract as the Contracting Officer may approve.

* * *

(5) The obligation of the Government to make any of the payments required by this Article shall be subject to any unsettled claims for labor or material or any claim the Government may have against the Contractor.

(c) Upon the making of said payments all obligations of the Government to make further payments or to carry out other undertakings hereunder shall cease forthwith and forever, except that all rights and obligations of the respective parties under the articles, if any, of this contract applicable to Patent Infringements and Reproduction Rights shall remain in full force and effect.

Contract No. 21216 contained a "Disputes" article as follows:

*Article 16 Disputes*

Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the Contracting Officer, subject to written appeal by the Contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties hereto. In the meantime, the Contractor shall diligently proceed with performance.

Finally, Article 20 of Contract No. 21216, included a notification provision as follows:

*Article 20 Insurance*

* * *

(c) The Contractor shall give the Contracting Officer or his representative immediate notice in writing of any suit or action filed against the Contractor arising out of the performance of this contract and of any claims against the Contractor, the cost and expense of which is reimbursable under the provisions of Article 3 hereof and/or such other provisions as are pertinent to allowable items of cost, and the risk of which is then uninsured or in which the amount claimed exceeds the amount of insurance coverage. The Contractor shall furnish immediately to the Contracting Officer copies of all pertinent papers received by the Contractor. Insofar as the following shall not avoid any policy or contract of insurance and, upon request of the Contracting Officer, the Contractor shall do any and all things to effect an assignment and subrogation in favor of the Government of all Contractor's rights and claims, except his rights and claims against the Government, arising from or growing out of such asserted claim, and, if required by the Contracting Officer, shall authorize representatives of the Government to settle and/or defend any such claim to represent or take charge of any such litigation affecting the Contractor.

A declaration, executed by Daniel S. Sobczynski, Director of Corporate Insurance for Ford Motor Company, pursuant to 28 U.S.C. § 1746, states that Ford has no records of any comprehensive general liability insurance coverage for the years from 1941 through 1946.

On April 21, 1945, the Government submitted a letter Termination Notice to Ford with respect to Contract No. 21216. Ford and the Government then negotiated Supplemental Agreement No. 69 to the contract as a termination settlement agreement. The preamble

to the agreement recites that it was "entered into pursuant to the Contract Settlement Act of 1944 ..., this 7th day of May, 1946, by the UNITED STATES OF AMERICA (hereinafter called 'the Government') represented by the Contracting Officer executing this Contract, and FORD MOTOR COMPANY ..., (hereinafter called 'the Contractor' ")";

Supplement Agreement No. 69 provided for a substantial payment premised upon Ford's termination claim and provided in its Articles 4(b) & (c) that:

(b) ... Said sum, together with all other sums heretofore paid, constitutes payment in full and complete settlement of the amount due the Contractor by reason of the termination of work, or otherwise, under the Contract and of all other claims of the Contractor under the Contract and under the Act [Contract Settlement Act of 1944], in so far as it pertains to the Contract, except as hereinafter provided in this Article and in Article 5.

(c) Upon the execution of this Supplemental Settlement Agreement, all rights and liabilities of the parties under the Contract and under the Act, insofar as it pertains to the Contract shall cease forthwith and be forever released except:

* * *

For the "except" portion of Article 4 of Supplemental Agreement No. 69 there were listed 16 categories set forth in numbered subparagraphs. Subparagraph (1) comprised an estimated $1,394,921.86 for the settlement of certain subcontracts with 24 listed companies. Subparagraph (2) comprised, "Claims by the Contractor against the Government, as to which his right of reimbursement is disputed, which are excluded without prejudice to the rights of the parties ...." The Subparagraph (2) claim matters included vouchers submitted by Ford which were the subject of inquiry by the General Accounting Office, a sum representing the past service portion of Ford's Retirement Annuity Plan, a sum for the recovery of additional Capital Stock Tax to be borne by the Contract for the fiscal years 1941 through 1945, and a cost not to exceed $2,341,949.74 relative to general plant overhead, advertising, legal services,

memberships, dues and donations during 1941 through April 30, 1945 not previously vouchored by or reimbursed to the Contractor due to similarity to claims previously disputed. Subparagraph (3) comprised, "Claims of the Contractor resulting from determinations or directions issued by duly authorized and constituted Federal Governmental agencies to the Contractor causing additional costs which are directly related to performance under the Contract."

Subparagraph (4) comprised,

Claims of the Contractor against the Government which are based upon responsibility of the Contractor to Third parties, employees, or former employees, and which involve costs reimbursable under the Contract, including without being limited thereto, wage adjustments which are approved by properly constituted Government Departments or Agencies or determined to be payable under the Davis–Bacon Act, but which are not now known to the Officers, Directors, or other personnel of the Contractor whose duties include the acquisition of such knowledge.

The exceptions for subparagraph (6) also involves cost items arising from agreements to return the facilities in good condition, "but which costs are not now known by the Contractor," for Subparagraph (7), claimed reimbursements disallowed by the Office of Defense Plants—Reconstruction Finance Corporation, and for Subparagraph (16), claims against the Government resulting from judgment and court costs, reasonable attorney's fees for private counsel and other costs incident to three listed suits against Ford in the state courts of California, Michigan, and New York.

Article 5 of Supplemental Agreement No. 69 provided:

ARTICLE 5.

(1) In addition to the payment of the sum provided for in Article 4, the Government will reimburse the Contractor for costs incurred in discharging claims described in subparagraphs (c)(1), (c)(3), (c)(4), (c)(6), (c)(7) and (c)(16) of said Article.

(2) Even though neither the existence nor the amount of any claim referred to in paragraph (4) of Article 4, may now be known to the Contractor, reimbursement for payments made by the Contractor in the discharge of any such claim shall include, along with wages and salaries, otherwise reimbursable, all additional amounts determined (either by approval of the Contracting Officer or by litigation as hereinafter provided) to be due and payable for overtime compensation and allowances under local, state or federal laws in connection with such wages and salaries.

(3) The Contractor shall promptly notify the Contracting Officer of any claims of the type described in subparagraph (4) of Article 4 which are asserted subsequent to the execution of this Agreement. In the event of the assertion of any such claim against the Contractor, he shall, if requested by the Contracting Officer, promptly and diligently proceed in good faith to assemble all data and information relative to such claim. The expenses incurred by the Contractor in the performance of this duty shall be reimbursable under the Contract.

(4) If the Contracting Officer shall determine that the best interests of the Government require that the Contractor initiate or defend litigation in connection with claims of third parties arising under the Contract or by virtue of its termination, the Contractor will proceed with such litigation in good faith and the costs and expenses of such litigation, including judgments and court costs, allowances rendered or awarded in connection with suits for wages, overtime or salaries, and other items, and reasonable attorneys' fees for private counsel when the Government does not furnish Government counsel, shall be reimbursable under the Contract. The term 'litigation' shall include suits at law or in equity and proceedings before any Governmental agency having jurisdiction over the claim.

Following the termination of Contract No. 21216, Ford vacated the Willow Run Plant Site in November of 1945, and Kaiser–Frazer Corporation then utilized the facility to manufacture automobiles under a government contract. *See* Major Randall J. Bunn, USAF, *Contractor Recovery for Current Environmental Cleanup Costs Under War II–Era Government Contract Indemnification Clauses,* 41 A.F.L.Rev.163, 170 (1997) (citing Warren B. Kidder, WILLOW RUN: COLOSSUS OF AMERICAN INDUSTRY, HOME OF HENRY FORD'S B–24 "LIBERATOR" BOMBER 18 (1995)). Kaiser–Frazer purchased the plant and in 1953 sold it to General Motors Corporation. *Id.* (citing Alan Clive, STATE OF WAR 21 (1979)). General Motors manufactured automotive transmissions. Up until 1964 sludge was pumped into the lagoon originally constructed by Ford in 1942. Ford sold the sludge lagoon to the University of Michigan in 1950 and the University conveyed it to Wayne County in 1977. *Id.* In 1979 the Michigan Department of Natural Resources ("DNR") discovered contaminated soil at the Willow Run Sludge Lagoon which eventually resulted in the United States Environmental Protection Agency ("EPA") issuing a special notice to Ford and General Motors, among others, pursuant to Section 122(e) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9622(e). This special notice informed Ford and General Motors of their potential liability for costs associated with a cleanup of the lagoon site and offered them the opportunity to conduct a remedial investigation and feasibility study. Ford and General Motors entered an August 11, 1988 Consent Order to perform the study in view of their status as "potentially responsible parties" ("PRPs").

Following the study, the Michigan Department of Environmental Quality asserted a claim that Ford, General Motors and other PRPs were responsible for a cleanup of the site. This claim was resolved by a Consent Judgment entered in the Circuit Court for Ingham County, Michigan on March 24, 1995. Ford and General Motors were mainly held responsible for the cost of site cleanup. In 1995, Ford and General Motors entered into binding arbitration to allocate the cost between them. On November 13, 1997, in a confidential and privileged Final Allocation Report, the arbitrator allocated 9.763 percent

of the total amount allocated, to Ford's operation of the Willow Run Bomber Plant between 1941 and 1945. Ford asserts that its share paid for the site cleanup equals $7,196,970.09.

On January 20, 1994, Ford sent a letter to the Commanding General, U.S. Army Materiel Command and Commanding General, Air Force Materiel Command which was styled as a "notification letter concerning a World War II contract." The letter referenced Contract No. 21216 and stated that "[t]his notice is given as provided by the terms of the contract and then-current procurement regulations concerning an Environmental Protection Agency action and Administrative Consent Order involving Ford with respect to such contract." The letter quoted the subparagraph (4) exception set forth in Article 4(c) to the Supplemental Agreement No. 69 Termination Settlement and noted Ford's contract obligation to provide notice of the assertion of any claim asserted against Ford within the subparagraph (4) exception. *See* Article 5(3) of Supplemental Agreement No. 69 quoted *supra.* Ford's January 20, 1994 letter also cited the Article 9(b)(1) termination provision of Contract No. 21216 concerning the assumption of obligations, commitments, and claims by the Government. The letter then provided information as to the 1988 EPA Special Notice and the August 11, 1988 Consent Order for the Remedial Investigation and Feasibility Study. Ford's letter also included the following paragraph:

For the reasons discussed in the attached memorandum (Enclosure 5), under the terms of Contract No. W535–ac–21216, the Government undertook and currently has a contractual obligation to Ford and to third parties to pay for the portion of the costs of the RI/FS and cleanup of the WRSL under CERCLA, and for similar costs with respect to the Willow Run Creek Site, that are attributable to such contract performance.

The January 20, 1994 memorandum attachment cited provisions set forth in Article 3 of Contract No. 21216 with respect to allowable costs as well as T.D. 5000 provisions stating that they "indicate that site cleanup costs resulting from contract perfor-

mance would be considered as contract costs to be charged directly to the contract." As to Article 9(b)(1) termination language of Contract No. 21216, the memorandum stated:

The clear meaning of the above (b)(1) language is that upon termination of the contract, the Government assumed and became liable for all obligations and commitments Ford incurred in performing the bomber contract. One of those obligations was to prevent injury to the public from the handling of any hazardous wastes generated in contract performance. Under the language of this clause, upon termination the Government assumed and became liable for all of Ford's obligations with respect to any such waste without further action by Ford.

The Ford memorandum, like the cover letter which transmitted it, also cited and relied on the subparagraph (4) exception set forth in Article 4(c) of the Supplemental Agreement No. 69 Termination Settlement.

On March 16, 1994, the Air Force Materiel Command Law Center notified Ford that its January 20, 1994 letter was being studied to determine the appropriate office for further disposition of the action. One year later on March 16, 1995, Ford addressed a letter to The Air Force Materiel Command "to put the Successor Contracting Officer to the above contract on notice that Ford and other parties involved expect to enter into a Consent Judgment with, pursuant to a Complaint filed by, the Michigan Department of Natural Resources on or about March 15, 1995, with respect to environmental cleanup of the sites involved under the above referenced World War II bomber contract." The letter further stated that, "Ford intends to bill the successor contracting officer under the bomber contract for reimbursement for that portion of the cleanup costs that is attributable to such contract performance." Ford asked for notification of the appointment of a successor contracting officer.

On August 10, 1995, the Air Force Materiel Command Director of Contract Law responded to Ford's request as follows:

At the request of the Commander, I have reviewed the information you and Mr. Karl Wolf provided on the 1941 B–24

Bomber production Contract No. W535-ac-21216, and was briefed on the meeting held in Washington D.C. on 23 March 1995. Though there remains a question on which agency, if any, has authority to handle this matter, I have agreed with the Army to be the point of contact.

We apologize for the length of time it has taken to formally respond to your request, but this matter has required extensive research, coordination, and advice of other Department of Defense offices and Federal agencies. After independent research and a thorough review of the information and authorities Ford has provided, it is our conclusion that they do not support a basis for recovery or the appointment of a contracting officer.

On March 12, 1998, Counsel for Ford sent a letter to the Director of Contract Law, Air Force Materiel Command which commenced as follows:

Pursuant to § 13(a) of the Contract Settlement Act of 1944, 58 Stat. 649, 41 U.S.C. § 113(a), Ford Motor Company ("Ford"), by undersigned counsel, respectfully demands written findings addressing its termination claim on Contract No. W535-ac-21216 (the "Contract") for $4,613,686.05 incurred, and approximately $2 million to be incurred, defending and discharging claims brought by the Environmental Protection Agency ("EPA") and the Michigan Department of Natural Resources (now the Department of Environmental Quality) under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, et seq. ("CERCLA") and the environmental laws of the State of Michigan for environmental damage to property that occurred in connection with Ford's performance of the Contract.

To support its liability assertion, Ford's March 12, 1998 letter cited "subparagraph (13) of paragraph (b) of Article 3 of the Contract ...," quoted supra. Also cited were, "The Termination provision of the Contract, Article 9(b) ...," and the "unknown claims reservation" in the Supplemental Agreement No. 69 Termination Settlement.

On March 18, 1998, Ford filed a Complaint against the United States in the Court of Federal Claims, No. 98-186 C, "for breach of contract under the Tucker Act, for failure to pay 'fair compensation' under the Contract Settlement Act of 1944, for payment of just compensation for a taking, and for damages for deprivation of its property without due process and for violation of the Public Debt Clause of the Fourteenth Amendment." Defendant filed a motion to dismiss and in its opposition, thereto, plaintiff asserted, in the context of argument as to what is required to comprise a "claim," that "[t]he Contract Disputes Act does not govern this action because the Contract was entered prior to November 1, 1978, and Ford has not elected to proceed under that Act. See Pub L. 95-563, § 16 ...." (Opposition Brief, filed August 17, 1998, No. 98-186 C at p. 8). By stipulation, Case No. 98-186 C was dismissed without prejudice pursuant to RCFC 41(a)(1)(B) on October 28, 1998.

On March 23, 1998, Ford filed a CERCLA contribution action, pursuant to 42 U.S.C. §§ 9607 and 9613(f) in the U.S. District Court for the Eastern District of Michigan, Docket No. 98-71306, seeking "[a] judgment against the United States in favor of Ford in an amount equal to any and all response costs, natural resource damages, expenses, fees (including attorneys fees), oversight costs and/or penalties incurred or paid by Ford regarding the site and arising from Bomber Plant operations."

Also on March 23, 1998, Ford, General Motors Corporation and four other plaintiffs who were parties to the March 24, 1995 Consent Judgment filed a second CERCLA action against the United States in the same District Court, Docket No. 98-71305. The statement of the case set forth in the Complaint reads as follows:

1. This is a civil action to recover past and future response costs and natural resource damages that have been or will be incurred or paid by Plaintiffs in connection with the alleged release or threat of release of hazardous substances into the soil, surface water and groundwater at the Willow Run Sludge Lagoon, Tyler Pond, Ypsilanti Drain No. 8, Edison Pond and the Willow Run Creek (collectively referred to as the "Site"). Some of the hazardous

substances that are located at the Site were transported to the Site through sewers connected to the Willow Run Airport and other facilities and operations of the United States, other than the Willow Run Bomber Plant, (collectively referred to as the "United States Facilities"). The United States Environmental Protection Agency ("EPA") and the Michigan Department of Natural Resources (now Department of Environmental Quality) ("MDNR") have asserted that hazardous substances have been and will continue to be released from the Site. The alleged release and threatened future release from the Site have caused Plaintiffs to incur response costs.

On June 16, 1998, the Department of Justice, as requested by EPA, filed a Complaint in the same District Court, Docket No. 98–60085, against Ford Motor Company, General Motors Corporation, and several other defendants. The statement of the case reads as follows:

1. This is a civil action for recovery of costs brought pursuant to Section 107 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9607, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("CERCLA"). The United States seeks to recover unreimbursed costs incurred for response activities undertaken in response to the release · and threatened release of hazardous substances at a facility located in Wayne and Washtenaw Counties, Michigan, known as the Willow Run Creek Superfund Site (hereinafter the "Site"). The United States also seeks a declaratory judgment, pursuant to CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), declaring that the Defendants are jointly and severally liable for any further response costs that the United States may incur as a result of releases or threatened releases of hazardous substances from the Site.

Following the stipulated dismissal of Ford's Court of Federal Claims action, Docket No. 98–186 C, Ford also dismissed its CERCLA action against the United States in the United States District Court for the Eastern District of Michigan, Docket No. 98–

71306. The two remaining CERCLA actions were settled by a Consent Decree entered by the District Court on June 18, 1999. Pursuant to the Consent Decree, the United States, Ford, and each of the other parties to either action contributed money to the Superfund. In addition, the United States paid Ford, General Motors and others $450,000.00, to settle allegations that certain Federal agencies were, for the purposes of CERCLA, "owners" or "operators" of facilities that had disposed of hazardous substances at the Willow Run Site.

On November 2, 1998, Ford's counsel addressed a letter to the Air Force Materiel Command resubmitting its March 12, 1998 demand. On March 9, 1999, Ford filed its Complaint initiating the instant action and asserting that jurisdiction exists "pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), and pursuant to the Contract Settlement Act of 1944, 41 U.S.C. § 113(b)." Plaintiff sets forth five counts in its Complaint: Count I asserts a material breach of Contract No. 21216 and its Supplemental Agreement No. 69; Count II asserts a failure to pay "fair compensation" in violation of the Contract Settlement Act of 1944, 41 U.S.C. § 101, *et. seq.*; Count III asserts a taking of Ford's property without just compensation in violation of the Fifth Amendment to the United States Constitution; Count IV asserts a deprivation of Ford's property without due process of law in violation of the Fifth Amendment to the United States Constitution; Count V asserts a violation of the Public Debt Clause of the Fourteenth Amendment to the United States Constitution.

Defendant has moved to dismiss and for summary judgment. Plaintiff has moved for summary judgment as to liability and damages.

## DISCUSSION

By Order, filed June 27, 2000, concerning the briefing to that date, it was noted that "additional briefing by the parties is needed to encompass all claims and defenses." The dispositive motion briefs filed prior to June 27, 2000, covered only Counts I and II of the Complaint. Following June 27, 2000, Count III was addressed by the parties in their

submissions. In the absence of any indication that partial summary judgment proceedings were contemplated, and in view of the text of the June 27, 2000 Order, it is concluded that Counts IV and V of the Complaint are no longer viable in this matter and will not be addressed.

The June 27, 2000 Order also noted that the parties had failed to address "the relationship of the Contract Disputes Act, 41 U.S.C. § 601, et. seq., or the Wunderlich Act, 41 U.S.C. §§ 321, 322, or the Article 16 'Disputes' provision of Contract No. W535–ac–21216, relative to the procedure by which any claim premised upon the jurisdiction granted by 28 U.S.C. § 1491(a)(1) is to be presented for resolution."

■ The parties continue to concur that the Contract Settlement Act of 1944 procedures are applicable to Ford's Claims asserted in Counts I and II of the Complaint. In this regard, it is determined that the parties are mistaken.

The Contract Settlement Act of 1944 was enacted "to effectuate speedy and final settlement of claims for wartime contracts." *American Employers Ins. Co. v. United States*, 812 F.2d 700, 703 (Fed.Cir.1987). Such a final settlement occurred with respect to Contract No. 21216 with the execution of a Termination Settlement Agreement in the form of Supplemental Argument No. 69 to the Contract. The numerous reservations listed in this Settlement Agreement in no way rendered it incomplete. For example, in Keith I. Parsons and Walter J. Blum, *In the Wake of Speedy Termination Settlements*, 13 U.Chi. L.Rev. 1,4 (1945) it is stated:

The second class of reservations pertains to various contractual rights and obligations which, because of their very nature, were intended by the parties to remain executory long after other phases of the contract are completed. Termination of a contract, in itself, does not alter the nature of rights and obligations such as those: (1) arising under the contract articles which relate to reproduction rights, patent infringements, inventions, and application for patents; (2) concerning the Government's contractual right to take the benefit of agreements reducing or otherwise affecting royalties paid or payable in connection with performance of the contract; (3) applicable to options, covenants not to compete, and covenants of indemnity; or (4) concerning defects in, and guarantees or warranties relating to, any completed articles or component parts furnished to the Government by the contractor pursuant to the contract. These rights and obligations are peculiar in that the facts upon which they operate might not come into existence or be uncovered until the lapse of considerable time. Nothing that can be done by the parties in settling a terminated contract will alter this condition, and so it has become standard practice to except such rights and obligations from settlement agreements. [Footnote omitted]

None of these standard reservations, however, should be considered a loose end of termination settlements. All of them are the usual strands dangling after Government contracts, and are in no sense an indication that a termination settlement is incomplete. [Footnote omitted] For this reason they need not be discussed at length.

It is conceivable that somewhere there may still exist an extant World War II contract that requires termination settlement action such that the Contract Settlement Act of 1944 procedures could be employed for this purpose, but that is not this case. *See* Ralph Wienshienk and Franklin Feldman, *The Current Challenge of Military Contract Termination*, 66 Harv. L.Rev. 47, 49 (1952). Here, Contract No. 21216 was terminated and a final settlement agreement negotiated that expressly covers the circumstances that plaintiff asserts entitle it to relief under the contract.

Plaintiff asserts that its CERCLA costs claim was reserved pursuant to subparagraph (4) of Supplemental Agreement No. 69, Article 4(c). Article 5(1) of Supplemental Agreement No. 69 states that "the Government will reimburse the Contractor for costs incurred in discharging claims described in subparagraphs ... (c)(4) ...." The (c)(4) exception involves only "costs reimbursable under the contract" which requires a con-

tracting officer's determination under Article 3 of the contract. Plaintiff also cites Contract Article 3(b)(13) as a source of entitlement. In short, it is undisputed that plaintiff is asserting a claim for payment *under* the provisions of Contract No. 21216, which Ford claims entitle it to reimbursement of CERCLA costs. Plaintiff is not contesting the amount it received pursuant to the 1946 termination settlement set forth in Supplemental Agreement No. 69, but is asserting a new claim, which accrued in the period 1994–1998, which it contends was excepted from this Settlement and which it claims is covered by contract provisions compelling relief.

■ Whatever the procedures were before 1963 for the resolution of a claim seeking recovery under relief granting clauses of a government contract containing a disputes clause, the decisions in *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), *United States v. Utah Construction & Min. Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966), and *United States v. Anthony Grace & Sons, Inc.*, 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966), established a clear pathway to follow, and prior Court of Claims rulings were rejected. Before court proceedings can be initiated on an "under the contract" claim, such as plaintiff presents here, the Supreme Court ruled that the Disputes Clause remedy must be exhausted and an administrative record developed for review under the standards of 41 U.S.C. §§ 321–322. Plaintiff could have elected to proceed under the Contract Disputes Act and file a direct action in this Court pursuant to 41 U.S.C. § 609, in lieu of following pre-Contract Disputes Act procedure. *See Tuttle/White Constructors, Inc. v. United States*, 228 Ct.Cl. 354, 656 F.2d 644 (1981). However, plaintiff expressly declined to so elect. *See* Plaintiff's Reply Brief, filed November 1, 2000 at p. 5.

In this circumstance plaintiff has not presented a claim in the correct format to the Air Force for a contracting officer's decision followed by, if needed, an appeal to the Armed Services Board of Contract Appeals, as the representative of the head of the Department. No administrative record has been created. Thus, dismissal of this action without prejudice is required as to Count I of the Complaint. *Zidell Explorations, Inc. v. United States* 192 Ct.Cl. 331, 338, 427 F.2d 735, 739 (1970). As was the situation in *Zidell* with the contracting officer's communications, the August 10, 1995 Air Force letter to plaintiff did not comprise a formal decision that would have triggered Ford's obligation to appeal within 30 days as provided in Article 16 of Contract No. 21216. Thus plaintiff remains free now to pursue its claims with the contracting officer and obtain the administrative resolution and record that is required before court action, in the nature of judicial review, can be initiated. *United States Steel Corp. v. United States* 177 Ct.Cl. 26, 37, 367 F.2d 399, 405–406 (1966); *See Appeals of National Gypsum Company*, ASBCA Nos. 53259, 53568, 03–1 BCA ¶ 32,-054, 2002 WL 31455519 (Oct. 25, 2002). It is assumed that a successor contracting officer will be promptly named by the Air Force if plaintiff so proceeds with this matter.

■ Plaintiff has set forth no evidence that would support a claim that it did not receive "fair compensation" in the Termination Settlement of Contract No. 21216. Moreover, the time to contest any recovery pursuant to the 1946 Termination Agreement has long since passed. Thus plaintiff's Count II claim shall also be dismissed.

■ With respect to plaintiff's Count III "takings" claim, the Order, filed June 27, 2000, noted in relevant part that,

The courts have uniformly held that retroactive liability for environmental cleanup under CERCLA is not a Fifth Amendment taking, because mitigation of the environmental hazard abates a threat to public health and the environment. *See United States v. Northeastern Pharm. & Chem. Co., Inc.*, 810 F.2d 726, 734 (8th Cir.1986), *cert. denied,* 484 U.S. 848[, 108 S.Ct. 146, 98 L.Ed.2d 102] (1987); *see also Yankee Atomic Elec. Co. v. United States,* 112 F.3d 1569, 1576 n. 6 (Fed.Cir.1997); *Atlas Corp. v. United States,* 895 F.2d 745, 756 (Fed.Cir.1990), *cert. denied,* 498 U.S. 811[, 111 S.Ct. 46, 112 L.Ed.2d 22] (1990) (Uranium Mill Tailings Radiation Control Act of 1978, 42 U.S.C. § 7901–7942 (1994)).

Thus, absent a viable "takings" claim premised on the liability created by CERCLA, the issue must devolve to an asserted "taking" of a claimed property right to reimbursement of CERCLA costs under Contract No. 21216.

However, as discussed previously, Supreme Court precedent, dating well prior to the enactment of CERCLA in 1980, requires that "under the contract" claims, such as plaintiff asserts here, "had to proceed through the contracting officer and the Board of Contract Appeals; full relief could be granted by the Board under the contract and the plaintiff could not properly bring suit until the Board's determination." *United States Steel Corp.*, 177 Ct.Cl. at 37, 367 F.2d at 405. At present, plaintiff has not established a property right to cost reimbursement under the Contract No. 21216 and no viable "takings" claim could result. *See Castle v. United States*, 301 F.3d 1328, 1342 (Fed.Cir.2002).

It is recognized that conclusions reached in this Opinion, that the claim plaintiff presents requires exhaustion of Disputes Clause procedures agreed to in Contract No. 21216 prior to initiating litigation rather than relying on statutory procedures specified for speedy and final settlement in the Contract Settlement Act of 1944, is contrary to the present position asserted by both parties. The Order, filed June 27, 2000, requested additional briefing on this point. In this briefing, plaintiff maintained a present entitlement to file suit pursuant to 41 U.S.C. § 113, whereas defendant asserted that plaintiff's suit is time-barred because it was not filed within the time limits there specified. This opinion concludes that the Contract Settlement Act of 1944 is not applicable to plaintiff's claim and proceedings prescribed by that Act were finally concluded when a settlement, covering all that plaintiff asserts to be the authority for establishing its present claim, was reached in 1946 with the execution of Supplemental Agreement No. 69. However, because the Contract Settlement Act issues were briefed by the parties, they will be addressed on the assumption, solely for purposes of argument, that the 1944 Act remains a viable platform for plaintiff's present claim presentation. As discussed previously, it must be recognized that any issues concerning reimbursement of costs under Contract No. 21216 are for initial determination by the Contracting Officer and on appeal by the Board of Contract Appeals prior to any review by this Court. Accordingly, addressing the briefed issues is without prejudice to their subsequent presentation and resolution pursuant to the contractual procedure called for by Supreme Court precedent.

Were the Contract Settlement Act of 1944 determined to form a viable basis for the initiation of the instant suit, it is concluded that plaintiff prevails on the timeliness issue, but defendant prevails on the issue of liability.

As to timeliness, Section 13(c) of the Contract Settlement Act of 1944, 41 U.S.C. § 113(c), provides that suit must be brought "within ninety days after delivery to [claimant] of the findings by the contracting agency" indicating the basis for determination of the war contractor's claim, or "in case of failure to deliver such findings, within one year after [claimant's] demand therefor." 41 U.S.C. § 113(c)(2)(i) & (iii). Defendant asserts that Ford's January 20, 1994 letter to the Air Force comprised a claim or a written demand pursuant to 41 U.S.C. § 113(a) and that the Air Force's letter of August 10, 1995, comprised a determination such as to trigger the applicable limitations periods. However, the January 20, 1994 letter was only a notification required by provisions of Contract No. 21216, either by Article 5(3) of Supplemental Agreement No. 69 or by Article 20(c) of the Contract. This notice did not trigger a limitation provision. Similarly, the August 10, 1995 letter was not an Air Force determination such as to trigger the ninety day Contract Settlement Act of 1944 limitation period any more than it served to trigger the 30 day appeal time set forth in the Disputes Clause of Contract No. 21216 discussed previously.[2]

---

**2.** To the extent the letter can be read to state that Ford's Contract Settlement Act of 1944 assertions "do not support a basis for recovery or the appointment of a contracting officer" the Air Force's 1995 position is correct.

Thus, were the Contract Settlement Act of 1944 held to be a valid basis for plaintiff's suit, this litigation would be timely commenced by the Complaint filing on March 9, 1999, based on Ford's claim submission of March 12, 1998 and the absence of an Air Force determination thereafter.

As to liability for CERCLA cost reimbursement, were the Contract Settlement Act held to be a viable basis for this litigation, the conclusion does not favor plaintiff. The issue involves the scope of the exception set forth in subparagraph (4) to Article 4(c) of the 1946 Termination Settlement negotiated as Supplemental Agreement No. 69 to Contract No. 21216. That is, among the several exceptions to the Termination Settlement were claims by Ford against the Government, based on the responsibility of Ford to third parties, which involve costs reimbursable under the contract, but which are not then known to the Officers, Directors, or other personnel of Ford whose duties include the acquisition of such knowledge. As Article 5(1) to Supplemental Agreement No. 69 expressly provided that "the Government will reimburse the Contractor for costs incurred in discharging claims in subparagraphs ... (c)(4) ...," it is necessary to consider the intended reach of this "unknown" claim exception. This also requires consideration of the scope of the Article 3 cost allowability provision of Contract No. 21216, because the settlement exception is limited to "costs reimbursable under the Contract." In particular, plaintiff relies upon the provisions of Article 3(b)(13) of the Contract providing that "cost and expenses incurred in the defense and/or discharge of such claims of others or account of death or bodily injury of persons or loss or destruction of or damage to property as may arise out of or in connection with the performance of the work under this contract shall be an allowable item of cost hereunder ...."

Defendant asserts that the CERCLA liability that Ford accrued in 1995–1997 is not reimbursable under the contract provisions relied upon by plaintiff. Defendant relies upon the cost principles applicable to Contract No. 21216, as also applied in *United States Steel Corp.*, 177 Ct.Cl. at 45–46, 367 F.2d at 411, and *Johns–Manville Corp. v. United States*, 13 Cl.Ct. 72, 161 (1987), *vacated on jurisdictional grounds*, 855 F.2d 1571 (Fed.Cir.1988), to require a close temporal relationship between cost of performance and contract performance. Clearly, the 50–year gap between the termination of Contract No. 21216 performance and the CERCLA cost accrual does not meet any reasonable temporal proximity requirement.

Plaintiff's response is to rely on cases where the Court of Claims held the Government liable for excess state unemployment taxes assessed after contract termination because of the contractor's experience during performance of their war contracts. *See United States Rubber Co. v. United States*, 142 Ct.Cl. 42, 160 F.Supp. 492 (1958); *Houdaille Indus., Inc. v. United States*, 138 Ct.Cl. 301, 151 F.Supp. 298 (1957). This subsequent tax issue appears to be expressly covered by Article 3(b)(12) of Contract No. 21216, but in any event, involves costs in close temporal proximity to contract performance. Moreover, unlike CERCLA, the tax statutes involved were on the books during the contract performance.

Based upon the provisions of the Contract Settlement Act of 1944, it is concluded that unlimited indemnity was not intended for "unknown claims" excepted from the 1946 settlement agreement.[3] Rather, the Act contemplates a settlement encompassing costs, mainly incurred prior to the termination date. This is evident from the interest provision set forth at 41 U.S.C. § 106(f), which provides "[e]ach contracting agency shall allow and pay interest on the amount due and

---

**3.** An unlimited indemnity agreement would raise serious issues as to its validity in view of the Anti–Deficiency Act, 31 U.S.C. § 1341. *See Hercules, Inc. v. United States*, 516 U.S. 417, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996); *California–Pacific Utilities Co. v. United States*, 194 Ct.Cl. 703, 715, 719–21 (1971). These validity issues would not be reduced by the Contract Settlement

Act of 1944 authorization for indemnity agreements set forth in 41 U.S.C. § 120(a). This is because 41 U.S.C. § 122 specifies the use of funds that are appropriated. *See* Burke, War Contract Termination; The Contract Settlement Act of 1944, 23 Chi. Kent L.Rev. 107, 152, (1945).

unpaid from time to time on any termination claim under a prime contract at the rate of 2½ per centum per annum for the period beginning thirty days after the date fixed for termination and ending with the date of final payment ...," *See Piggly Wiggly Corp. v. United States,* 112 Ct.Cl. 391, 432, 81 F.Supp. 819, 829 (1949). It is recognized that in *Houdaille,* 138 Ct.Cl. at 325, 151 F.Supp. at 313, the Court of Claims, without analysis, deviated from the text of the Act and awarded interest based on the later date a payment was due.[4]

However, notwithstanding its application, the extent of the Act's intended coverage can be seen from the interest provision which does commence payments thirty days after the termination date of the contract.

Accordingly, it is concluded that the "unknown" claim exception in the Termination Settlement covers those claims where liability accrued during the contract performance period and costs are in temporal proximity to contract termination but the existence of the claim is not known as of the date of the termination settlement. This is consistent with Article 9(b)(1) of Contract No. 21216 which provided that upon termination, the Government would assume and become liable for commitments and claims that the Contractor may have "theretofore" in good faith undertaken or incurred. As CERCLA did not come into existence until a number of years after contract termination, the liability incurred by Ford under CERCLA lacks the temporal proximity to contract performance required for recovery as a Contract Settlement Act of 1944 claim, assuming, for argument purposes, the viability of the Act for present claim presentation.[5]

## CONCLUSION

For the foregoing reasons, it is **ORDERED** that:

(1) Count I of plaintiff's Complaint shall be **DISMISSED**, without prejudice, so that plaintiff, if it chooses, may seek relief under Contract No. 21216 pursuant to the Disputes Article of the Contract;

(2) The remaining counts of plaintiff's Complaint shall be **DISMISSED**;

(3) This ruling resolves all pending motions and requires the entry of final judgment **DISMISSING** the Complaint;

(4) **NO COSTS** shall be assessed.

4. In applying the interest provision of the Contract Disputes Act, 41 U.S.C. § 611, the date set in the Act for the commencement of interest has been strictly followed, notwithstanding, the time cost was incurred by the contractor. *Servidone Construction Corp. v. United States,* 931 F.2d 860, 862 (Fed.Cir.1991). Strict application of 41 U.S.C. 106(f) would require payment of interest from 1945 were plaintiff to recover under a Contract Settlement Act of 1944 Claim.

5. Ford did have an alternative statutory remedy. It could have advocated full allocation of the Willow Run Bomber Contract response costs to the United States in the CERCLA District Court proceedings. *See Cadillac Fairview/California, Inc. v. Dow Chemical Company,* 299 F.3d 1019 (9th Cir.2002).